IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

ADAM P. FAUST et al.,

       Plaintiffs,

       v.                             Case No. 1:21-cv-00548-WCG

THOMAS J. VILSACK et al.,

       Defendants.

---

## MEMORANDUM IN SUPPORT OF MOTIONS FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

WISCONSIN INSTITUTE FOR LAW & LIBERTY

Rick Esenberg
*rick@will-law.org*

Daniel P. Lennington
*dan@will-law.org*

Luke Berg
*luke@will-law.org*

Katherine D. Spitz
*kate@will-law.org*

330 E. Kilbourn, Suite 725
Milwaukee, WI 53202-3141
Phone: 414-727-9455
Fax: 414-727-6385

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................. 1

FACTS ............................................................................................................. 2

   I.   The American Rescue Plan Act of 2021 ............................................. 2

   II.  Defendants' Implementation of Section 1005 of ARPA ................... 3

   III. The Government's Interest in Forgiving Loans Based on Race ......... 5

   IV. USDA's Past Effort to Remedy its Own Race Discrimination ........... 7

   V.  The Plaintiffs ................................................................................. 11

ARGUMENT ................................................................................................ 12

   I.   Standard of Review ....................................................................... 12

   II.  Plaintiffs Are Likely to Succeed on Their Claim That Section 1005 of
       ARPA Violates the Equal Protection Guarantee ............................ 13

       A.   The Racial Classifications in Section 1005 of ARPA Do Not Serve a
            Compelling Governmental Interest ........................................ 14

       B.   ARPA's Race-Based Loan Forgiveness is not Narrowly Tailored ... 17

   III. Plaintiffs Will Be Irreparably Harmed if an Injunction is not Granted ........ 23

   IV. The Public Interest and Balance of Harms Weigh Heavily in Favor of an
       Injunction ..................................................................................... 28

CONCLUSION ............................................................................................. 30

## INTRODUCTION

This week, the United States government started rolling out a massive race-discrimination program as a tool to cure what it calls "systemic racism" in America. Plaintiffs, who are victims of this program, ask that this program be halted immediately.

In the American Rescue Plan Act of 2021 (ARPA), Congress passed a $4 billion loan forgiveness program for farmers and ranchers which is currently being implemented by Defendants (both officials of the United States Department of Agriculture). Eligibility to participate in the program, however, depends entirely on whether the indebted farmer or rancher is white or non-white. White farmers are excluded; non-white farmers are included. Defendants have already begun the process of forgiving loans this week and plan to forgive most loans during June 2021.

Racial classifications, like the one here, "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993). Such race-based programs "are simply too pernicious to permit any but the most exact connection between justification and classification." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003). No such "exact connection" exists here. Defendants can neither provide specific and concrete evidence supporting a compelling government interest nor meet any of the settled standards of narrow tailoring. In fact, Plaintiffs are unaware of any court that has ever upheld such a broad, race-based program. The program therefore should be enjoined immediately before the money is spent and cannot be recalled.

# FACTS

"Farming is a hard way to make a living." *Pigford v. Glickman*, 185 F.R.D. 82, 86 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000). Because of the "whim of conditions completely beyond their control," such as weather, labor, supply chains, international trade, state and federal policy, and most of all prices, "many farmers depend heavily on the credit and benefit programs of [USDA] to take them from one year to the next." *Id.* USDA, through the Farm Service Agency (FSA), makes "direct and guaranteed farm ownership and operating loans to family-size farmers and ranchers who cannot obtain commercial credit from a bank."[1] This money is used to purchase land, livestock, equipment, feed, seed, fertilizer, and other supplies. A large portion of the two million American farms, including all twelve Plaintiffs from nine states, are indebted to USDA directly or to banks that offer USDA-backed loans.

This case is about Congress's plan to forgive these government loans, but only for non-white farmers.

## I.  The American Rescue Plan Act of 2021

President Biden signed ARPA into law on March 11, 2021.[2] Under Section 1005 of ARPA, Congress appropriated "such sums as may be necessary" to pay for the cost of loan modifications and payments to eligible farmers and ranchers. *See* ARPA, § 1005(a)(1). The loan payments can amount to "120 percent of the outstanding

---

[1] USDA Website, Grants and Loans (last visited May 26, 2021) *available at* https://www.usda.gov/topics/farming/grants-and-loans. The Court may take judicial notice of documents on official government websites: *See, e.g., Laborer's Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002).

[2] *Available at* https://www.congress.gov/bill/117th-congress/house-bill/1319.

indebtedness" owed by eligible farmers and ranchers as of January 1, 2021. ARPA, § 1005(a)(2). Loans eligible for forgiveness include "direct farm loan[s]" made by USDA or "farm loan[s] guaranteed" by USDA. ARPA, § 1005(a)(2)(A), (B).[3]

Not all farmers and ranchers with eligible loans will receive these payments, however. ARPA limits loan forgiveness to "socially disadvantaged farmer[s] or rancher[s]." ARPA, § 1005(a)(2). "[T]he term 'socially disadvantaged farmer or rancher' has the meaning given in [7 U.S.C. 2279(a)]." *Id.* Under that statute, a "'socially disadvantaged group' means a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." 7 U.S.C. § 2279(a)(6). In sum, loan forgiveness is dependent on a farmer or rancher's race. *Id.*

## II.  Defendants' Implementation of Section 1005 of ARPA

Under Defendants' interpretation of "socially disadvantaged farmer or rancher," only certain races and nationalities are considered "socially disadvantaged" and therefore eligible for the relief under Section 1005 of ARPA. According to USDA's website, "[e]ligible borrowers include those who identify as one or more of the following: Black/African American, American Indian, Alaskan Native, Hispanic/Latino, Asian American, or Pacific Islander."[4]

---

[3] Often, direct or guaranteed USDA loans are called "FSA-direct" or "FSA-guaranteed," which simply refers to the Farm Service Agency, which is the part of USDA that handles most of its financing.

[4] USDA Website, American Rescue Plan Debt Payments (Last Visited May 25, 2021), *available at* https://www.farmers.gov/americanrescueplan.

Defendants' race-based definition of "socially disadvantaged" is confirmed elsewhere on its website[5] and in USDA regulations, *see, e.g.,* 7 C.F.R. §§ 760.107(b)(1), 1410.2. In explaining this race-based qualification, Defendant Ducheneaux wrote in a blog post, "[i]f you are a Black, Native American/Alaskan Native, Asian American or Pacific Islander, or are of Hispanic/Latino ethnicity, with one of the loans listed above, you are eligible for the loan payment."[6]

USDA has recently laid out the timing for its implementation: On May 21, 2021, USDA announced that it "expects payments to begin in early June and continue on a rolling basis."[7] In a section labeled "How to Participate," USDA writes: "Eligible Direct Loan borrowers will begin receiving debt relief letters from FSA in the mail on a rolling basis, beginning the week of May 24. […] After reviewing closely, eligible borrowers should sign the letter when they receive it and return to FSA." *Supra* n. 4. USDA then explains that in June 2021, it will "begin[ ] to process signed letters for payment," and "[a]bout three weeks after a signed letter is received, socially disadvantaged borrowers who qualify will have their eligible loan balances paid and

---

[5] USDA confirms as follows: "The American Rescue Plan Act uses Section 2501 of the Food, Agriculture, Conservation, and Trade Act of 1990 as the definition of socially disadvantaged farmers and ranchers, which includes those who identify as one or more of the following: Black, American Indian/Alaska Native, Hispanic, Asian, and Hawaiian/Pacific Islander." USDA Website, "American Rescue Plan Debt Payments FAQ" (Last Visited May 25, 2021), *available at* https://www.farmers.gov/americanrescueplan/arp-faq.

[6] FSA Administrator Zach Ducheneaux, USDA Website, FAQs on American Rescue Plan Debt Relief for Socially Disadvantage Borrowers (last visited May 25, 2021) *available at* https://www.usda.gov/media/blog/2021/04/16/faqs-american-rescue-plan-debt-relief-socially-disadvantaged-borrowers.

[7] USDA Website, Press Release May 21, 2021 (last visited May 25, 2021) *available at* https://www.usda.gov/media/press-releases/2021/05/21/historic-move-usda-begin-loan-payments-socially-disadvantaged

receive a payment of 20% of their total qualified debt by direct deposit, which may be used for tax liabilities and other fees associated with payment of the debt."[8]

USDA will start by (again, this month) paying off direct farm loans, meaning farm loans made directly by USDA. *See* ARPA, § 1005(a)(2)(A). Other loans, such as those funded by banks and guaranteed by USDA, will be forgiven later. *See* ARPA, § 1005(a)(2)(B). This prioritization is because USDA estimates that 85% of all eligible borrowers have direct loans, compared to 15% who have USDA-backed loans issued by banks.[9]

To determine which farmers and ranchers should receive this benefit, USDA explains that it will use data submitted by farmers on form AD-2047,[10] despite the clear indication on this form that this "[d]emographic information is used by USDA for statistical purposes only and will not be used to determine an applicant's eligibility for programs or services for which they apply."[11]

## III. The Government's Interest in Forgiving Loans Based on Race

Defendants have made several public comments explaining its interest in implementing this race-based loan forgiveness program. On March 25, 2021, Defendant Vilsack offered written testimony to the House of Representatives

---

[8] USDA Website, Debt Payment Timeline (last visited May 25, 2021), *available at* https://www.farmers.gov/americanrescueplan

[9] USDA Website, American Rescue Plan Debt Payments FAQ, Question 25 (last visited May 25, 2021), *available at* https://www.farmers.gov/americanrescueplan/arp-faq.

[10] *Id.*, at Question 30.

[11] Defendants' form, AD-2047, also contains their admission that "the USDA [is] prohibited from discriminating based on race, color, national origin, …." *See* USDA Website, AD-2047, https://www.farmers.gov/sites/default/files/documents/AD2047-01192021.pdf.

Committee on Agriculture. *See* Secretary Tom Vilsack, "Written Comments Before House Committee On Agriculture" (Mar. 25. 2021).[12] According to Defendant Vilsack, ARPA § 1005 addresses "systemic racism" and "provides funding to address longstanding racial equity issues within the Department and across agriculture." *Id.* This funding, according to Defendant Vilsack, will "respond to the cumulative impacts of systemic discrimination and barriers to access that have created a cycle of debt." *Id.* Defendant Vilsack argued that prior efforts to remedy "specific, individualized discrimination" have "failed to do the necessary work" to address the "systemic discrimination [that] socially disadvantaged producers face." *Id.* Later, in oral testimony before the committee, Defendant twice disavowed that ARPA's purpose was to address "specific acts of discrimination," instead emphasizing that the purpose of loan forgiveness was to address the "cumulative impact of discrimination over time."[13]

On March 26, 2021, Defendant Ducheneaux authored a blog post giving details about Section 1005 of ARPA. *See* Zach Ducheneaux, "American Rescue Plan Socially Disadvantaged Farmer Debt Payments," (March 26, 2021).[14] According to this document, "USDA recognizes that socially disadvantaged farmers and ranchers have

---

[12] Defendant Vilsack's written testimony is available from the U.S. House Committee Repository here: https://docs.house.gov/meetings/AG/AG00/20210325/111400/HHRG-117-AG00-Wstate-VilsackT-20210325.pdf

[13] *See* C-SPAN, Secretary Tom Vilsack, Oral Testimony Before the House Committee on Agriculture (Mar. 25, 2021) *available at* https://www.c-span.org/video/?510242-1/house-hearing-black-farmers-us (time markers 00:39:30, 1:50:30).

[14] https://www.farmers.gov/connect/blog/loans-and-grants/american-rescue-plan-socially-disadvantaged-farmer-debt-payments

faced systemic discrimination with cumulative effects that have, among other consequences, led to a substantial loss in the number of socially disadvantaged producers, reduced the amount of farmland they control, and contributed to a cycle of debt that was exacerbated during the COVID-19 pandemic." *Id.*

USDA's website also contains a narrative explaining its justification for the race-based qualifications in the loan forgiveness program. *See supra* n. 4. According to this description, "socially disadvantaged producers have faced discrimination" that has "prevented them from achieving as much as their counterparts who do not face these documented acts of discrimination." *Id.* Moreover, "socially disadvantaged communities" have been impacted by a "disproportionate share" of COVID impacts. *Id.* USDA believes that the loan forgiveness program will "address the cumulative effects of discrimination among socially disadvantaged producers with a program of debt relief and long-term racial equity work." *Id.* The program will also "increase opportunity, advance equity and address systemic discrimination in USDA farm programs, including historic debt payments for socially disadvantaged borrowers who hold a qualifying USDA farm loan." *Id.*

## IV.    USDA's Past Effort to Remedy Its Own Race Discrimination

In their public statements about ARPA § 1005, Defendants refer, both explicitly and implicitly, to USDA's history of intentional discrimination against minority farmers and ranchers.[15] Again, Defendants disavow any attempt to remedy

---

[15] USDA Website, Press Release May 21, 2021 (last visited May 25, 2021) https://www.usda.gov/media/press-releases/2021/05/21/historic-move-usda-begin-loan-payments-socially-disadvantaged.

any "specific acts of discrimination" arising from USDA's past actions, but instead seek to remedy "systemic discrimination." *See supra*. For the Court's background, this section will briefly summarize USDA's past discriminatory history and its efforts to remedy that conduct. *See generally* Cong. Research Serv., Report No. RS20430, *The Pigford Cases: USDA Settlement of Discrimination Suits By Black Farmers* (May 29, 2013).[16]

For many years, African-American farmers complained that local county officials—who at the time were responsible for approving USDA loans—"exercised their power in a racially discriminatory manner, resulting in delayed processing or denial of applications for credit and benefits by African-American farmers not experienced by white farmers who were similarly situated." *Pigford*, 206 F.3d at 1214. Although USDA provided a complaint procedure, this process was initially inadequate, and the farmers eventually sued alleging many acts of intentional discrimination from 1981 to 1996. *Pigford*, 185 F.R.D. at 89. In general, the *Pigford* class-action lawsuit alleged "(1) that [USDA] willfully discriminated against them when they applied for various farm programs, and (2) that when they filed complaints of discrimination with the USDA, the USDA failed properly to investigate those complaints." *Pigford v. Glickman*, 182 F.R.D. 341, 343 (D.D.C. 1998).

After years of litigation as well as intervention by Congress to expand the statute of limitations, the parties settled and signed a consent decree. According to the District Court, this was "a negotiated settlement intended to achieve much of

---

[16] https://nationalaglawcenter.org/wp-content/uploads/assets/crs/RS20430.pdf.

what was sought without the need for lengthy litigation and uncertain results."
*Pigford*, 185 F.R.D. at 95.

The consent decree provided two tracks for victims of USDA's discrimination. Under "Track A," farmers with "little or no documentary evidence" of intentional discrimination could get a settlement if they proved the following: (1) they owned, leased, or attempted to own or lease farm land, (2) they applied for a loan from USDA between 1981 and 1996, (3) the loan was subject to some type of adverse action, and (4) they suffered damage. *Pigford v. Glickman*, 185 F.R.D. at 96. Successful farmers under Track A would receive: "(1) a cash payment of $50,000; (2) forgiveness of all debt owed to the USDA incurred under or affected by the program that formed the basis of the claim; (3) a tax payment directly to the IRS in the amount of 25% of the total debt forgiveness and cash payment; (4) immediate termination of any foreclosure proceedings that USDA initiated in connection with the loan(s) at issue in the claim; and (5) injunctive relief including one-time priority loan consideration and technical assistance." *Id.*

Under "Track B," farmers "who believe they can prove their cases with documentary or other evidence by a preponderance of the evidence—the traditional burden of proof in civil litigation—have no cap on the amount they may recover." *Id.* at 95. "Claimants who choose Track B must prove their claims by a preponderance of the evidence in one-day mini-trials before a third-party neutral known as the arbitrator." *Pigford v. Schafer*, 536 F. Supp. 2d 1, 4 (D.D.C. 2008). Under Track B, successful claimants were "entitled to actual damages, the return of inventory

property that was foreclosed and other injunctive relief, including a one-time priority loan consideration." *Pigford*, 185 F.R.D. at 97.

As a result of *Pigford,* "over one billion dollars has been awarded to the approximately 16,000 successful claimants in the form of direct payments, loan forgiveness, and tax relief." *In re Black Farmers Discrimination Litig.,* 856 F. Supp. 2d 1, 11 (D.D.C. 2011). A second lawsuit, *Pigford II*, was funded by Congress in the amount of $1.15 billion, with similar Track A and Track B settlement mechanisms. *Id.* at 14.

After *Pigford* and *Pigford II*, other lawsuits followed and settled on similar terms. A lawsuit alleging discrimination against Native American farmers, *Keepseagle v. Veneman*, 2001 WL 34676944 (D.D.C. Dec. 12, 2001), resulted in a class-wide settlement involving "an administrative claims process for Native American farmers that was similar, though not identical, to the process established in *Pigford I.*" *Cantu v. United States*, 908 F. Supp. 2d 146, 149 (D.D.C. 2012). *Keepseagle* resulted in the distribution of $680 million in damages and $80 million in debt forgiveness. *Cantu v. United States,* 565 F. App'x 7, 8 (D.C. Cir. 2014).

Similar lawsuits brought by women and Hispanic farmers resulted in an administrative claims process in *Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006), and *Love v. Johanns*, 439 F.3d 723 (D.C. Cir. 2006). According to USDA, successful

claimants under *Garcia* and *Love* may seek cash awards and tax relief from a judgment fund worth $1.33 billion.[17]

It is against this backdrop of about $4 billion in payments to rectify USDA's prior intentional discrimination that Congress enacted another $4 billion program to address systemic racism generally "across [the] agriculture" industry. *See* Vilsack Written Comments, *supra* n. 12.

## V. The Plaintiffs

Plaintiffs are twelve white farmers and ranchers from nine different states. Some Plaintiffs farm row crops, some raise beef cattle, chickens, or hogs, and some operate dairy farms; but whatever their background, each Plaintiff currently has a direct or USDA-backed loan and would otherwise be eligible for loan forgiveness but for their race. *See* Compl. ¶¶8–17; Exs. 1–10. USDA confirmed directly to one farmer, Teena Banducci, that "there's no application" for loan forgiveness because "it is based off your ethnicity." Ex. 9 (email attachment).

Like many farmers and ranchers indebted to USDA, most Plaintiffs received their loans as "beginning farmers." *See, e.g.,* Exs, 1–10. Under this popular program, USDA acknowledges that its loan programs provide a "special focus on the particular credit needs of farmers and ranchers who are in their first 10 years of operation."[18] Most Plaintiffs, like Jon Stevens from Minnesota, start with nothing and use this

---

[17] *See* USDA, "Hispanic and Women Farmers and Ranchers Claim Resolution Process" (Mar. 31, 2016), *available at* https://www.usda.gov/sites/default/files/50601-0002-21.pdf.

[18] *See* USDA Website, Beginning Farmers and Ranchers (last visited May 31, 2021), https://www.fsa.usda.gov/programs-and-services/farm-loan-programs/beginning-farmers-and-ranchers-loans/index.

loan to buy their first farm: "Although I am a fifth-generation farmer, I had to buy all my land and equipment. I started from scratch." Ex. 4, ¶2.

Finally, Plaintiffs have all encountered some type of social disadvantage in their life. Three plaintiffs are women, and as explained below, were previously labeled by Defendants as "socially disadvantaged" due to their gender for the purposes of other programs (but not this one). Adam Faust, a dairy farmer from Calumet County, was born with spina bifida and lost both feet after a farming accident. Doc. 7, Compl. ¶8, Ex. 1. Other Plaintiffs had significant hardships while starting their careers as farmers. *See* Ex. 2 (Baird); Ex. 3 (Slaba). Also, during the pandemic, each Plaintiff encountered significant hardships resulting from higher prices, depressed demand, labor shortages, and lack of supplies. *See* Exs. 1–10. For example, due to COVID, Iowa farmer Christopher Bohnencamp "had to euthanize about 200 fat hogs because we couldn't get them into a packing house." Ex. 7, ¶5. Missouri farmer Cheryl Ash had to resort to selling hogs on Facebook when the prices dropped from $43 to $5 per pig. Ex. 6, ¶5. The declarations spell out many more instances of hardships and disadvantages. In sum, all Plaintiffs have encountered the types of hardships familiar to all farmers and ranchers, regardless of skin color.

## ARGUMENT

## I.     Standard of Review

The standards for issuing temporary restraining orders are identical to the standards for preliminary injunctions. *See Long v. Bd. of Educ., Dist.* 128, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001). A party seeking a temporary restraining order or preliminary injunction must demonstrate "(1) some likelihood of succeeding on the

merits, and (2) that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If a plaintiff meets these factors, the court proceeds to "a balancing phase, where it must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell v. Snyde*rs, 990 F.3d 539, 545 (7th Cir. 2021).

## II. Plaintiffs Are Likely to Succeed on Their Claim That Section 1005 of ARPA Violates the Equal Protection Guarantee

The Constitution forbids "discrimination by the general government … against any citizen because of his race." *Gibson v. State of Mississippi*, 162 U.S. 565, 591 (1896). "A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). When confronted with such a racial classification, "[a]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny*."* *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995). "Under strict scrutiny, the government has the burden of proving that racial classifications are narrowly tailored measures that further compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005) (citation omitted).

Here, Defendants unquestionably impose a racial classification. ARPA limits loan forgiveness to "socially disadvantaged farmer[s] or rancher[s]," ARPA, § 1005(a)(2, which Defendants interpret to mean "those who identify as one or more of the following: Black/African American, American Indian, Alaskan Native, Hispanic/Latino, Asian American, or Pacific Islander." *Supra* n. 4. White farmers, like Plaintiffs, are excluded because they are white. Strict scrutiny therefore applies.

## A. The Racial Classifications in Section 1005 of ARPA Do Not Serve a Compelling Governmental Interest

To establish a compelling governmental interest in establishing race-based benefits, the government must point to "identified discrimination" "with some specificity" and "with a strong basis in evidence." *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996) (citation omitted). Using this type and quality of evidence, "the government has a compelling interest in remedying past discrimination only when three criteria are met." *See Vitolo v. Guzman*, Nos. 21-5517/5528, 2021 WL 217218, *4 (6th Cir. May 27, 2021).

First, the policy must target a specific episode of past discrimination rather than generalized discrimination throughout society or within an industry. *Shaw*, 517 U.S. at 909; *Croson*, 488 U.S. at 498; *Adarand*, 515 U.S. at 226. Such an allegation of generalized discrimination is "not adequate because it provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Shaw*, 517 U.S. at 909. In short, "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Id*. (citing *Wygant*, 476 U.S. at 274–76, 288). Over several decades, the Supreme Court has repeatedly reaffirmed this basic principle

that remedying past societal discrimination does not justify race-conscious government action. *See, e.g., Parents Involved,* 551 U.S. at 731; *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 310 (1978).

Second, there must be strong evidence of *intentional* discrimination in the past. *Croson*, 488 U.S. at 503. "Statistical disparities don't cut it." *Vitolo*, 2021 WL 217218, at *4; *see Builders Ass'n of Greater Chicago v. Cty. of Cook*, 256 F.3d 642, 644–45 (7th Cir. 2001). "Raw statistical disparities prove little; they certainly do not prove *intentional* discrimination. … [N]ot all of these disparities are plausibly attributable to intentional, or for that matter unintentional, discrimination." *McNamara v. City of Chicago*, 138 F.3d 1219, 1222–23 (7th Cir. 1998). Relying on statistical disparities only aims the government toward "racial balancing," and this can never be a "compelling end in itself [because it] would effectively assure that race will always be relevant in American life, and that the ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race will never be achieved." *Parents Involved*, 551 U.S. at 730.

Third, if the government "show[s] that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of [a] local … industry," then the government can act to undo the discrimination. *Croson*, 488 U.S. at 492 (plurality opinion). In the Seventh Circuit, the government must prove that it "knowingly perpetuated the discrimination," and therefore became "a kind of joint tortfeasor, coconspirator, or aider and abettor." *Builders Ass'n of Greater Chicago*, 256 F.3d at 645. Importantly, such evidence must be "recent." *See, e.g., id.*

Here, Defendants cannot meet any of these three required criteria. First, Defendants point chiefly to generalized allegations of discrimination within society and agriculture, claiming that their racial preferences will address "systemic racism" "within the Department and across agriculture." *See* Secretary Tom Vilsack, "Written Comments Before House Committee On Agriculture" (Mar. 25. 2021). Defendants believe a race-based loan forgiveness program is necessary to "respond to the cumulative impacts of systemic discrimination and barriers to access that have created a cycle of debt." *Id*. Importantly, Defendants disavow any need to address "specific acts of discrimination." *Id*. This type of generalized "evidence" is not enough. *E.g., Parents Involved,* 551 U.S. at 731; *Bakke*, 438 U.S. at 310.

Second, Defendants point to racial disparities and statistics, not intentional discrimination, arguing that "deeply embedded rules and policies" have prevented minority farmers and ranchers from "achieving as much as their counterparts." *See* Secretary Tom Vilsack, "Written Comments Before House Committee On Agriculture" (Mar. 25. 2021). Again, racial disparities "don't cut it." *Vitolo*, 2021 WL 217218, at \*4; *see, e.g., Builders Ass'n of Greater Chicago*, 256 F.3d at 644–45.

And third, to the extent Defendants allege that they "knowingly perpetuated the discrimination," *Builders Ass'n of Greater Chicago*, 256 F.3d at 645, the evidence supplied is remote and not recent. USDA's prior intentional discrimination addressed in *Pigford* relate to prior acts of discrimination from 1981 to 1996. 185 F.R.D. at 89. Defendants have not pointed to any claim that they have *recently* acted as "a kind of joint tortfeasor, coconspirator, or aider and abettor." *Builders Ass'n of Greater*

*Chicago*, 256 F.3d at 645; *see Brunet v. City of Columbus*, 1 F.3d 390, 409 (6th Cir. 1993) (discrimination from 14 years earlier too remote to support affirmative action program); *Hammon v. Barry*, 826 F.2d 73, 76-77 (D.C. Cir. 1987) (discrimination from 18 years earlier too remote).

For these reasons, Defendants cannot establish a compelling government interest in enacting race-based loan forgiveness.

### B.      ARPA's Race-Based Loan Forgiveness Is Not Narrowly Tailored

Narrow tailoring requires "a close match between the evil against which the remedy is directed and the terms of the remedy." *Builders Ass'n of Greater Chicago*, 256 F.3d at 646. In other words, a program must discriminate no more than is necessary to address the harm it is intended to remedy. *Shaw*, 517 U.S. at 909–10; *Adarand*, 515 U.S. at 224, 235, 237–38; *Builders Ass'n of Greater Chicago*, 256 F.3d at 644. Defendants' race-based loan forgiveness fails all the traditional narrow-tailoring factors.

Specifically, for a policy to survive narrow-tailoring analysis, the government must show "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003); *Croson*, 488 U.S. at 507. "This requires the government to engage in a genuine effort to determine whether alternative policies could address the alleged harm." *Vitolo*, 2021 WL 217218, at *6. Therefore, a court must not uphold a race-conscious policy unless it is "satisfied that no workable race-neutral alternative" would achieve the compelling interest. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013).

Here, the government could have used any number of targeted alternatives. Look no further than *Pigford*: in that settlement, the government offered individualized loan forgiveness and cash payments to specific individuals based on evidence they submitted. 185 F.R.D. at 96. Under that program, and similar programs in *Garcia, Love, Keepseagle*, USDA distributed targeted relief of about $4 billion. *See supra*. Here, Defendants attempt to dole out $4 billion in loan forgiveness to farmers and ranchers based on a single criterion: race. Such a broad and untargeted program is not narrowly tailored in any sense.

Defendants have not established why they cannot use the $4 billion in a more targeted way. Courts have frequently struck down programs that fail, as here, to even attempt to address the issues identified with race-neutral alternatives first. *Croson*, 488 U.S. at 507 (set-aside plan not narrowly tailored where "there does not appear to have been any consideration of the use of race-neutral means"); *Builder's Ass'n*, 298 F. Supp. 2d at 741 (describing possible race-neutral options that would more directly remedy disparities in public contracts but had not been tried); *Back v. Carter*, 933 F. Supp. 738, 757 (N.D. Ind. 1996) (striking down racial and gender quota requirement for judicial commission in part because no attempt had been made to increase diversity by racially neutral means).

In fact, race is the *only* factor taken into consideration when determining eligibility for the program, in contravention of a long line of Supreme Court cases on the matter. *E.g., Grutter*, 539 U.S. at 334 (race conscious program permissible where race is used "in a flexible, nonmechanical way" as part of "individualized

consideration of each and every applicant"); *Gratz*, 539 U.S. at 271–72 (policy awarding points to certain minority groups did not provide individualized consideration but rather made race the decisive factor in admissions).

In addition, a policy is not narrowly tailored if it is either overbroad or underinclusive in its use of racial classifications. *Croson*, 488 U.S. at 507–08; *Gratz v. Bollinger*, 539 U.S. 244, 273–75 (2003). Defendants identify the following minorities as considered "socially disadvantaged" and therefore eligible for loan forgiveness: "Black, American Indian/Alaska Native, Hispanic, Asian, and Hawaiian/Pacific Islander." *Supra* n. 5. These categories are both overinclusive and underinclusive to achieve Defendants' stated goals of remedying past discrimination within agriculture.

First, Defendants' remedy for past discrimination is overinclusive. The program includes every farmer and rancher who fits into the racial categories even if they are recent farmers who did not experience discrimination from USDA or the agriculture industry in general. As explained above, USDA has a policy priority of loaning money to "beginning farmers." *See* USDA Website, "Beginning Farmer and Rancher Loans."[19] A farmer is a "beginning farmer" if he or she has been farming for fewer than 10 years. *Id*. If Defendants are attempting to cure past discrimination by USDA or even general discrimination "across agriculture," Defendants cannot justify including farmers and ranchers who recently started (perhaps even in 2020).

---

[19]    *Available    at*    https://www.fsa.usda.gov/programs-and-services/farm-loan-programs/beginning-farmers-and-ranchers-loans/index.

Moreover, Defendants cannot explain how forgiving debt owed by new farmers (who, by definition, received USDA loans) makes up for past, intentional discrimination against other farmers who did not receive USDA loans.

Defendants' categories are also classically overinclusive because they include racial categories unrelated to the previously documented cases of USDA-backed discrimination: Asians, Hawaiians, and Native Alaskans. *Croson*, 488 U.S. at 506. As the Court in *Croson* rightfully pondered, if the law was narrowly tailored "to compensate black contractors for past discrimination, one may legitimately ask why they are forced to share this remedial relief with an Aleut citizen who moves to Richmond tomorrow?" *Id.* at 506. As the D.C. Circuit noted, the "random inclusion of racial groups for which there is no evidence of past discrimination in the construction industry raises doubts about the remedial nature of the Act's program." *O'Donnell Const. Co. v. D.C.*, 963 F.2d 420, 427 (D.C. Cir. 1992) (citation omitted). Defendants' prior programs seeking to remedy race discrimination have targeted Blacks, Hispanics, Native Americans, and women. Defendants have not made the case for discrimination in the American agriculture industry against Alaskans, Hawaiians, or Asians.

Second, Defendants' racial categories are underinclusive if they hope to cure discrimination against all minority farmers. When the federal government says "Asian," for example, it does not actually mean people whose ancestors are from the 45 countries within the continent of Asia. The United States government believes that an "Asian" is someone whose ancestors are from the following specific areas in

Asia: "Far East, Southeast Asia, the Indian Subcontinent, or the Pacific Islands." *See, e.g.,* 28 C.F.R. § 42.402; *see generally* 13 C.F.R. § 124.103 ("Who is socially disadvantaged?"). Asians from the Middle East are excluded (e.g. Turkey, Syria, Lebanon, and Iran), as are Asians from North Asia (e.g. Afghanistan, Kazakhstan, and Mongolia). *Id.* And when the federal government says, "Black," it does not mean every person whose ancestors are from Africa. *See, e.g.,* 32 C.F.R. § 191.3 ("A [white] person [has] origins in any of the original peoples of . . . North Africa."); 28 C.F.R. § 42.402 (same). Under federal law, for example, those whose ancestors are from Morocco, Tunisia, Libya, or Egypt are "white." *See, e.g., Vitolo*, 2021 WL 2172181, at *7 (noting distinctions among Asians by the Small Business Administration).

If Defendants' goal is to end discrimination against all minorities in the American agriculture industry, then Defendants inexplicably pick among some Asians and not others, some Africans and not others. There is no rhyme or reason to Defendants' choices. For example, a farmer whose ancestors are from Vietnam will receive loan forgiveness, but not a farmer whose ancestors are from Lebanon. Similarly, two farmers with African heritage could receive different levels of benefits depending on their ancestors are Zimbabwe or Libya. If Defendants' goal is to help all minority famers, then its remedy is woefully underinclusive.

Finally, Defendants' categories are also underinclusive because they exclude women farmers. For decades, USDA has considered women to be "socially disadvantaged." *See e.g.,* 7 C.F.R. §§ 761.2; 7.3; 1430.402. In fact, USDA still considers women socially disadvantaged for certain loans. *See* Ex. 8, Affidavit of Lori Watkins,

¶ 7. Moreover, USDA has adopted a settlement process by which women can seek a remedy for past discrimination. See 7 C.F.R. § 15d.4; *see also Love v. Connor*, 525 F. Supp. 2d 155, 157–58 (D.D.C. 2007). USDA has even implemented special loan programs for women on the grounds that they are "socially disadvantaged."[20]

But not anymore. Defendant Ducheneaux explained on March 26, 2021, that USDA, the Farm Service Agency, and Defendants no longer believe that women farmers and ranchers qualify as "socially disadvantaged farmers and ranchers" (at least for the purposes of loan forgiveness). According to Defendant Ducheneaux, "[g]ender is not a criteria [*sic*] in and of itself, but of course women are included in these categories."[21]

If a race-conscious program is overinclusive and underinclusive, as demonstrated above, then it is not narrowly tailored. As the Northern District of Illinois put it, a program is not narrowly tailored if a "third generation Japanese-American from a wealthy family and with a graduate degree from MIT qualifies (and an Iraqi immigrant does not)." *Builder's Ass'n of Greater Chicago v. City of Chicago*, 298 F. Supp. 2d 725, 739–40 (N.D. Ill. 2003). Such overinclusive and underinclusive programs are inflexible and lack "meaningful individualized review," which are fatal tailoring flaws. *Id.* As recently noted by the Sixth Circuit:

---

[20] *See* Farm Service Agency, "Loans for Socially Disadvantaged Farmers and Ranchers, Fact Sheet (Aug. 2019), available at https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/2019/sda_loans-fact_sheet-aug_2019.pd (last visited May 29, 2021).

[21] *See* Administrator Ducheneaux, "American Rescue Plan Socially Disadvantaged Farmer Debt Payments" (Mar. 26, 2021) *available at* https://www.farmers.gov/connect/blog/loans-and-grants/american-rescue-plan-socially-disadvantaged-farmer-debt-payments

Imagine two childhood friends—one Indian, one Afghan. Both own restaurants, and both have suffered devastating losses during the pandemic. If both apply to the Restaurant Revitalization Fund, the Indian applicant will presumptively receive priority consideration over his Afghan friend. Why? Because of his ethnic heritage. It is indeed "a sordid business" to divide "us up by race.

*Vitolo*, 2021 WL 2172181, at *7; *see also Builders Ass'n of Greater Chicago*, 256 F.3d at 647 ("Anyone of recent foreign origin might be able to demonstrate that he or she was a victim of ethnic discrimination, but to *presume* such discrimination merely on the basis of having an ancestor who had been born on the Iberian peninsula is unreasonable.")

In addition to ARPA § 1005 serving no compelling government interest, it is not narrowly tailored. Therefore, Plaintiffs have a strong likelihood of success on the merits.

## III. Plaintiffs Will Be Irreparably Harmed if an Injunction is not Granted

There are multiple irreparable harms that warrant a temporary restraining order and a preliminary injunction.

First, the clear equal protection violation itself is an irreparable harm that warrants an injunction. Indeed, when a "deprivation of a constitutional right is involved … most courts hold that no further showing of irreparable injury is necessary." Wright & Miller, 11A Fed. Prac. & Proc. § 2948.1 (3d. ed.); *e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."); *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of

constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (citation omitted); *Vitolo*, 2021 WL 2172181, at *8.

As the Supreme Court has recognized, "a racial classification causes 'fundamental injury' to the 'individual rights of a person.'" *Shaw,* 517 U.S. at 908. Indeed, the *primary* injury "in an equal protection case of this variety is the denial of equal treatment" itself. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). Plaintiffs, and thousands of other farmers, are being treated differently by the government and denied access to much needed COVID-relief funds based solely on their race. Such unequal treatment "demeans us all." *Grutter*, 539 U.S. at 353 (2003) (Thomas, J., concurring in part and dissenting in part).

Accordingly, multiple federal courts around the country have held that irreparable injury is presumed when the government discriminates on the basis of race. *E.g.*, *Vitolo*, 2021 WL 2172181, at *8; *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984) ("[W]e hold that because of the subtle, pervasive, and essentially irremediable nature of racial discrimination, proof of the existence of discriminatory housing practices is sufficient to permit a court to presume irreparable injury."); *O'Donnell Const. Co.*, 963 F.2d at 428–29; *San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F. Supp. 2d 1021, 1034 (N.D. Cal. 1999) ("[P]laintiffs were suffering irreparable injury by being subjected to unconstitutional racial classifications."); *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan*, 543 F. Supp. 198, 218 (S.D. Tex. 1982) ("Victims of discrimination suffer irreparable

injury, regardless of pecuniary damage."); *Small v. Hudson*, 322 F. Supp. 519, 529 (M.D. Fla. 1970) ("Racial discrimination is per se irreparable harm to the minority group."); *see also DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 292 (D.D.C. 2012) ("Because DynaLantic succeeds on the merits of its as-applied constitutional equal protection claim, the Court finds this deprivation of Plaintiff's constitutional rights constitutes irreparable harm.").

Although the Seventh Circuit has not squarely addressed whether there is a presumption of irreparable harm from explicit and ongoing race discrimination in a federal program, it has held that irreparable harm is presumed for First Amendment violations, *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006), Second Amendment violations, *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011), and Fourteenth Amendment violations, *Planned Parenthood of Indiana & Kentucky, Inc. v. Adams*, 937 F.3d 973, 990 (7th Cir. 2019). As with these other constitutional rights, the Constitution's equal protection guarantee protects "intangible and unquantifiable interests" that cannot be compensated by monetary damages, *Ezell*, 651 F.3d at 699.

Even putting aside the harm inherent in unconstitutional race discrimination, an injunction is also warranted to give Plaintiffs a fair and equal shot at much-needed COVID relief funds. ARPA was designed to offer a one-time injection of funds to support individuals and businesses impacted by the COVID-19 pandemic. Part of that relief package included loan forgiveness for farmers with USDA loans (but only farmers of certain races). Once the money budgeted for that purpose is spent, there

will be no practical way to un-spend the money and provide disfavored farmers with an equal shot at equivalent relief without vastly increasing the cost of the program. On the other hand, if this Court puts the program on hold before the funds are disbursed, Congress (or USDA) will have to amend the program to eliminate the unconstitutional race discrimination, and Plaintiffs will have a fair shot at any amended version that is open to all on an equal basis without regard to race.

The COVID pandemic did not discriminate on the basis of race. Many white farmers were hit just as hard as farmers of other races were. Plaintiffs Ash and Bohnencamp lost a significant number of hogs, which they either had to euthanize or sell at severely reduced prices to neighbors on Facebook. Exs. 6 & 7. Plaintiffs Baird, Banducci, and Stevens experienced problems with supplies, including significant price increases and shortages. Exs. 2, 4 & 9. Plaintiffs Faust and Shields experienced a massive drop-off in commodity prices. Exs. 1 & 10. Because of plants shutting down, Plaintiffs Slaba and Watkins had severe disruptions in their own animal herds. Exs. 3 & 8. These are just a few examples of the problems COVID caused, and these hardships had nothing to do with race.

To be clear, Plaintiffs do not ask this Court to order a particular remedy (such as requiring Defendants to forgive all of their loans as well). Instead, Plaintiffs simply ask this Court to enjoin Defendants from implementing a loan forgiveness program based solely on the race of the borrowers. The "fix" will ultimately be up to Congress (or, possibly, USDA). Still, there are multiple obvious fixes that would give Plaintiffs a fair and equal shot at loan relief: Congress and/or USDA could, for example, offer

loan forgiveness to farmers who were most economically impacted by the COVID pandemic, without regard to their race; or they could split the budgeted funds among all farmers, offering partial loan forgiveness on an equal basis to all; or, of course, they could fully forgive *all* farmers' loan (though this would vastly increase the cost of such a program). Under any of these approaches, Plaintiffs would have an equal shot at getting some relief.

But if this Court does not issue an injunction, USDA will proceed to spend the allocated money and forgive the loans of only minority farmers (though not all minorities), while this case is pending. Indeed, USDA has indicated that it has already begun that process, and "is working hard to ensure that we provide this relief as expeditiously as possible to those who qualify." Zach Ducheneaux, *FAQs on American Rescue Plan Debt Relief for Socially Disadvantaged Borrowers*, United States Department of Agriculture (April 16, 2021).[22] If that happens, Congress and USDA will have no reason to fix the program to provide this or similar relief on an equitable basis to all, including white farmers. They will have accomplished their goal of race-based COVID relief. At that point, any remedy will difficult, if not impossible. Damages—if they are even available[23]—would either require forgiving *all* farmers'

---

[22] *Available at* https://www.usda.gov/media/blog/2021/04/16/faqs-american-rescue-plan-debt-relief-socially-disadvantaged-borrowers

[23] "Federal constitutional claims for damages are cognizable only under *Bivens*." *Loumiet v. United States*, 828 F.3d 935, 945 (D.C. Cir. 2016). And while the Supreme Court has recognized a Bivens claim for a certain type of equal protection claim, *Davis v. Passman*, 442 U.S. 228 (1979) (gender discrimination in federal employment), the Supreme Court has more recently explained that courts must be very reluctant to extend Bivens to any new "context"—where "context" does not mean a different constitutional provision, but simply a

loans (after all, the only criteria is that the borrower falls within certain racial categories, ARPA § 1005(a)(2)), vastly increasing the cost of the program; or would require this Court to speculate as to who would have received relief under a hypothetical, but constitutional, amended version of the program. Neither approach is viable; so an injunction is necessary to give Plaintiffs and other white farmers an equal shot at this much-needed relief. *See O'Donnell Const. Co. v. D.C.*, 963 F.2d 420, 428 (D.C. Cir. 1992) (holding that the "difficulty" of an "adequate compensatory [remedy] or other corrective relief at a later day" "weighs heavily in favor of granting [an] injunction" against a race-based government benefit program).

## IV. The Public Interest and Balance of Harms Weigh Heavily in Favor of an Injunction

The public interest would also be served by an injunction, because "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge Inc. v. Mich. Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir. 1994); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (same); *see Higher Soc'y of Indiana v. Tippecanoe Cty., Indiana*, 858 F.3d 1113, 1116 (7th Cir. 2017) ("the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional"). Indeed, "issuance of a preliminary injunction would serve the public's interest in maintaining a system of laws free of unconstitutional

---

different type of case with any "meaningful" differences to the only three contexts where the Court has recognized a Bivens damages remedy. *Hernandez v. Mesa*, 140 S. Ct. 735, 741–50 (2020); *see also id.* at 750–53 (Thomas, J., and Gorsuch, J., concurring) (calling for *Bivens* and *Davis* to be overruled).

racial classifications." *O'Donnell Const. Co.*, 963 F.2d at 429 (issuing a preliminary injunction against a D.C. law that required a certain percentage of contracts to be awarded to minority-owned businesses); *Vitolo*, 2021 WL 2172181, at \*4, \*8. Plaintiffs seek the simple vindication of their right to be treated equally under the law. This is surely in the public interest.

Finally, an injunction will not cause any harm. With respect to Defendants, the "government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented." *Doe v. Kelly*, 878 F.3d 710, 718 (9th Cir. 2017); *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) ("[N]o substantial harm can be shown in the enjoinment of an unconstitutional policy.").

And with respect to minority farmers who are currently eligible for loan forgiveness, an injunction will not prevent Congress and/or USDA from continuing to offer them loan relief; it will simply prohibit offering such relief based solely on unconstitutional racial categories. While an injunction may delay loan relief somewhat while Congress and/or USDA fixes the program to comply with the Constitution, any harm from that delay pales in comparison to being shut out entirely of much-needed relief based solely on the color of one's skin. Plaintiffs do not seek any special treatment, only equal treatment under the law. If an injunction is granted, all farmers will have to be treated equally, regardless of race, as the Constitution requires.

## CONCLUSION

Plaintiffs request that the Court issue a temporary restraining order and preliminary junction enjoining Defendants from implementing Section 1005 of ARPA in a way that discriminates based on race.

Dated: June 3, 2021

WISCONSIN INSTITUTE FOR LAW & LIBERTY
Attorneys for Plaintiffs

Rick Esenberg
*rick@will-law.org*

*/s/ Daniel P. Lennington*
Daniel P. Lennington
*dan@will-law.org*
Luke Berg
*luke@will-law.org*
Katherine D. Spitz
*kate@will-law.org*
330 E. Kilbourn, Suite 725
Milwaukee, WI 53202-3141
PHONE: 414-727-9455
FAX: 414-727-6385