**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION**

_____

**CASE NO. 1:21-CV-548-WCG**

_____

ADAM P. FAUST; CHERYL J. ASH; JAMES C. ASH; CHRISTOPHER C. BAIRD;
BRANDON BANDUCCI; TEENA J. BANDUCCI; CHRISTOPHER D. BOHNENKAMP;
JOSEPH W. SCHMITZ; THEODORE G. SHIELDS, JR.; JAY T. SLABA; JONATHAN P.
STEVENS; and LORI J. WATKINS,

Plaintiffs,

v.

THOMAS J. VILSACK, in his official capacity as Secretary the U.S. Department of Agriculture;
and ZACH DUCHENEAUX, in his official capacity as Administrator of the Farm Service
Agency;

Defendants.

_____

**BRIEF OF AMICI CURIAE
THE RURAL COALITION, THE INTERTRIBAL AGRICULTURE COUNCIL,
NORTH CAROLINA ASSOCIATION OF BLACK LAWYERS LAND LOSS
PREVENTION PROJECT, AND
23 ADDITIONAL FARMING ADVOCACY ORGANIZATIONS
IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

_____

Keisha Stokes-Hough
Alexandra M. Jordan
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
Tel:    (334) 956-8200

_Counsel for Amici Curiae_

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE .......................................................................... 1

INTRODUCTION ............................................................................................... 9

ARGUMENT ..................................................................................................... 10

    I.  Congress Enacted Section 1005 to Address Two Compelling Government Interests: Remedying Discrimination Against Minority Farmers, and Ensuring that COVID-19 Relief Reaches Those Most Impacted by the Crisis. ........................ 10

        A.  Minority farmers have been harmed by persistent discrimination in the USDA's farm loan programs. ............................................................... 10

        B.  Minority farmers' precarious financial circumstances have been exacerbated by the COVID-19 pandemic. ........................................... 13

    II.  Section 1005 Is a Narrowly Tailored Measure, Employing the Least Restrictive Means to Achieve Congress's Policy Goals. .............................................. 16

        A.  Race-neutral efforts have been attempted, and failed to remedy the effects of USDA's long and persistent history of discrimination...................................... 16

        B.  Relief under Section 1005 will benefit the most vulnerable and underserved farmers: those impacted by USDA discrimination and at the greatest risk of failure. ............................................................................................ 19

        C.  Section 1005 provides temporary relief in response to the exigencies of the COVID-19 pandemic. ............................................................................ 21

    III.  The Balance of Harms Weighs Strongly Against a Preliminary Injunction, Because Minority Farmers and the Public Will Be Harmed, But Plaintiffs Are Not Harmed.................................................................................................. 21

        A.  Discrimination in lending has made it more difficult for minority farmers to survive times of crisis. ........................................................................... 22

        B.  Delay in delivering debt relief will irreparably harm minority farmers. ............. 23

        C.  Delaying assistance to minority farmers is also harmful to the public interest.................................................................................................. 25

        D.  An injunction of Section 1005 would undermine Congress's goal of remedying ongoing inequities in USDA funding. ............................................. 26

CONCLUSION.................................................................................................. 28

Case 1:21-cv-00548-WCG   Filed 06/23/21   Page 2 of 30   Document 42

## INTEREST OF AMICI CURIAE

Amici Curiae are twenty-six advocacy organizations that work with and represent the interests of farmers and ranchers across the country.

The **Rural Coalition** is a collection of more than 50 diverse, community-based member organizations that have worked for 42 years to advance the interests of historically underserved producers and rural communities. Since 1978, the Rural Coalition has developed and secured passage of over 45 key federal policies to strengthen rural agriculture, with a critical focus on equitable access and new generation of diverse producers.

The **Intertribal Agriculture Council** (IAC) is a nonprofit 501(c)(3) national organization to pursue and promote the conservation, development, and use of Tribal agriculture resources for the betterment of the 574 federally recognized Tribal governments and over 80,000 Tribal producers. The IAC was founded on the heels of the 1980s farm financial crisis when a report to Congress determined that Tribal producers needed direct and specific technical assistance to support access to USDA programs, especially access to credit through Farm Service Agency. Many of our individual Tribal membership have a direct interest in the outcome of this case and will be irreparably harmed if the debt relief is not provided.

**North Carolina Association of Black Lawyers Land Loss Prevention Project** (LLPP) was founded in 1983 and is a non-profit, public interest organization providing comprehensive legal services and technical support to North Carolina's financially distressed and socially disadvantaged farmers and landowners seeking to preserve their farms, homes, land, and rural livelihoods. Many of our farmers were struggling to retain their farm operations prior to the COVID-19 Pandemic, which has only worsened their conditions. Debt relief is critical for farmers who have experienced discrimination in the implementation of USDA programs, so that they may receive timely access to credit and secure favorable loan terms and servicing of loans.

1

The **Natural Resources Defense Council** (NRDC) is a national, not-for-profit environmental and public health membership organization that works, on behalf of our 3 million members and activists, to ensure the rights of all people to clean air, clean water, and healthy communities. NRDC is committed to advancing environmental and social justice and seeks to break down the patterns of disproportionate environmental burdens borne by people of color who face social or economic inequities, including in our agricultural system and farming communities.

**Rural Advancement Fund of the National Sharecroppers Fund, Inc.** (RAF) is a 501(c)(3) organization that represents rural farmers, with special focus on African American farmers and young farmers. Denial of American Rescue Plan funds to RAF members will immediately impact at least 20 African American farmers in three counties in South Carolina, many of whom own small family farms that have been passed down for generations.

The **National Latino Farmers and Ranchers Trade Association** (NLFRTA) is a nonprofit based in Washington, DC, that organizes, engages, and empowers Latino farm and ranching advocacy groups, farmworkers transitioning into farm ownership, and, generally, small producers, throughout the United States and beyond. Latino farmers have historically suffered — and continue to suffer — under the discriminatory treatment of USDA staff. The relief offered under the 1005 program is the only possible relief for operations that are rendered even more vulnerable by economic, market, and climate conditions intensified by the pandemic.

**American Indian Mothers, Inc.** (AIMI) is a not-for-profit organization serving the education, health, social service, and agriculture and cultural needs of American Indians and minorities in North Carolina. AIMI serves our communities through 12 different programs in order to fill the gaps in services throughout rural communities. The socially disadvantaged farmers

Case 1:21-cv-00548-WCG   Filed 06/23/21   Page 4 of 30   Document 42

served by AIMI have experienced extreme hardships during the COVID Pandemic, and without the Section 1005 assistance, these farmers will not be able to plant or plan for the future.

**Arkansas Land and Farm Development Coalition** (ALFDC) is a nonprofit organization founded in 1980 with the mission of stopping Black farmers from losing their land and family farm operations. We serve farmers who, after decades of discrimination and the pandemic, urgently need the debt relief afforded justly to them in Section 1005. Any delay in this relief will limit the few options available for them to retain land and continue to pass land to the incoming generations for the benefit and viability of the rural communities we have long served.

**Cottage House Incorporation** (CHI), founded in 2007, works to promote sustainable agriculture solutions through education of new and beginning farmers, veterans, youth, and women in agriculture. During the pandemic, the farmers served by CHI have experienced food insecurity; been unable to sell their cows, hogs, pigs, and chickens; and lacked funds to buy feed for their animals. Without debt relief, they won't be able to buy seeds or plant or plan for the future. CHI is especially concerned about five producers with FSA Youth loans: without Section 1005, these young farmers will go into default and may not have a way to continue farming.

**Family Farm Defenders** (FFD) is a 501(c)(3) organization and has over 3500 members in all 50 states, including many farmers of color. FFD's mission is to create a farmer-controlled and consumer-oriented food and fiber system, based upon democratically controlled institutions that empower farmers to speak for and respect themselves in their quest for social and economic justice. To this end, FFD supports agroecology, farm and food worker rights, racial justice, animal welfare, consumer safety and right to know, fair trade, and food sovereignty.

**Kansas Black Farmers Association** (KBFA), a 501(c)(3) organization, was founded by fourteen African American Kansas farmers in 1999. KBFA represents more than 150 rural and

urban farmers, agribusiness owners, youth farmers, and associate organizations and works to sustain Black land ownership. Over 50 of KBFA's members are eligible for Section 1005 relief, which they are depending on to continue their farming. The relief will allow the farmers to plant/drill — though a few weeks late due to late rains. An injunction will further delay this season, resulting in some of KBFA's farmers not having a milo, corn, or soybean crop this year.

The **Land Stewardship Project** (LSP) is a member-driven nonprofit organization founded in 1982 in Minnesota to foster an ethic of stewardship for farmland, promote sustainable agriculture, and develop sustainable communities. LSP represents over 6,000 members and thousands more supporters who are farmers, food system workers, and other residents dedicated to creating transformational change in our food and farming system. LSP believes it is critical to address the needs of farmers of color who have endured decades of discrimination in USDA programs and have not received adequate support during the pandemic. The debt relief included in the American Rescue Plan is a necessary step toward creating resilient rural communities.

The **National Young Farmers Coalition** (Young Farmers) aims to shift power and change policy to equitably resource a new generation of working farmers. Young Farmers represents aspiring and working farmers, ranchers, and land stewards who are reorienting agriculture in service to our communities. Young Farmers believes justice is foundational to a transformation in our food and farm systems; we've advocated for the Section 1005 loan-forgiveness program and other necessary programs that serve to increase the security and accessibility of agricultural livelihoods for farmers of color.

The **Oklahoma Black Historical Research Project, Inc.** (OBHRPI) was founded in 1998 to assist historically underserved farmers and ranchers by means of outreach, technical training, and cultural awareness to operate sustainable farms and ranches with an emphasis on sustaining

historic American Indian and African American communities. We are advocates for Socially Disadvantaged Farmers and Ranchers who have been historically underserved and deserve — and urgently need — the relief that is due to them in the ARP.

**Operation Spring Plant, Inc.** is a grassroots 501(c)(3) organization with over 34 years of experience organizing rural and urban, predominantly Black, small family farmers in North Carolina and throughout the southern US. We have served over 1500 farmers, youth, and landowners per year in North and South Carolina, Georgia, and Oklahoma. The farmers we serve are counting on Section 1005 relief to overcome numerous challenges, from a severe drought in 2013 to crop losses, restaurant closures, and inaccessible markets due to COVID-19.

The **Texas Coalition of Rural Landowners** was founded and incorporated in Cypress, Texas, as a Domestic Nonprofit Corporation on May 30, 2021, to assist farmers and ranchers who have sought aid from various USDA agencies. The Coalition's mission is to develop training to provide farmers information, skills, and awareness, in a cultural context; assist rural landowners building strong communities; build an equitable and sustainable food system that is beneficial to underserved rural landowners; and provide assistance to underserved landowners. The producers served by the Coalition have struggled with discrimination, and the disruptions of the pandemic. They are depending upon the relief in the American Rescue Plan.

**World Farmers** advocates for and supports immigrant, refugee, and historically underserved small-scale farmers from farm to market. Started in 1984, our Flats Mentor Farm Program, located in Lancaster, MA, provides access to the land, farming infrastructure, and technical assistance in agricultural production and marketing necessary for several hundred small-scale diversified farmers to grow and market their produce. Section 1005 debt relief payments are critical to supporting farmers without generational wealth in this country, including the immigrant

5

and refugee farmers with whom we work, and to supporting those farmers of color who are operating within an agricultural system of historic exclusion and displacement.

**Farm Aid** is a nonprofit organization whose mission is to keep family farmers on the land. Since the first Farm Aid Concert in 1985, Farm Aid has raised $60 million to promote a strong and resilient family farm system of agriculture. Farm Aid operates 1-800-FARM-AID to provide immediate and effective support services to farm families in crisis. We have worked with thousands of farmers and hear every day how the pandemic has stressed them to the limit — most of all the nation's socially disadvantaged farmers. We have joined this action because we know these farmers need and deserve the aid that is being delayed by this action.

The **Health, Environment, Agriculture, Labor Food Alliance** (HEAL) is a national multi-sector, multi-racial coalition of 50 organizations who represent over two million producers, workers, indigenous groups, scientists, advocates, organizers, and activists. Many of HEAL's members and their communities have borne the brunt of COVID-19, and many of the producers who are part of our Alliance have gone above and beyond to produce and distribute food for their communities during the pandemic — and have gone into debt as a result. The HEAL Food Alliance opposes preventing the USDA from moving forward with a program designed to relieve debt for farmers of color, and supports the USDA's defense of debt relief for these farmers.

The **National Family Farm Coalition** (NFFC) was established in 1986 to avert the demise of family farmers caught in the 1980s farm credit crisis. NFFC membership consists of 30 grassroots farm, ranch, and fishing organizations in 42 states and the nation's capital. Our members are fighting for food providers' rights, fair prices, clean air and water, strong local economies, and much more. NFFC believes that an attempt to overturn this act of Congress that enables USDA to

meet the urgent and particular needs of socially disadvantaged producers has no merit and only undermines the ability of family farmers who feed us with dignity and respect.

The **Rural Advancement Foundation International-USA** (RAFI-USA) was founded in 1990 to serve and advocate for farmers struggling to keep their farms. Today, our mission is to challenge the root causes of unjust food systems, supporting and advocating for economically, racially, and ecologically just farm communities. Our Farmers of Color Network program works with more than 300 farmers of color in North Carolina and the Southeast U.S.

The **National Sustainable Agriculture Coalition** (NSAC), founded in 2009, is an alliance of 130+ member organizations and their combined 2+ million members that advocates for federal policy reform to advance the sustainability of agriculture, food systems, natural resources, and rural communities. NSAC has heard directly from our members how Black, Indigenous and other People of Color (BIPOC) are treated worse than white farmers within the same applicant pool, including: when seeking fair and timely access to credit, when attempting to apply for and obtain direct USDA aid through support programs (including the Coronavirus Food Assistance Program), and when applying to participate in conservation programs. Consequently, these farmers are at direct risk of losing their livelihoods without urgent relief.

**California FarmLink** is a 501(c)(3) nonprofit organization and lender certified by the U.S. Treasury as a Community Development Financial Institution (CDFI). In 2020, more than 70% of California FarmLink's loans provided capital to Socially Disadvantaged Farmers and Ranchers, including Latina/o farmers in the Central Coast region and Hmong-American refugee farmers in the Fresno region. California FarmLink has at least three borrowers who are in immediate risk of bankruptcy and will likely enter bankruptcy if they do not receive debt relief.

7

**Community Farm Alliance** (CFA) was founded by Kentucky farmers in 1985 during the Farm Crisis as a vehicle for farmers to collaboratively address the issues facing them, their neighbors and their communities. The COVID-19 pandemic was particularly hard for Kentucky BIPOC farmers, and CFA responded by rallying private donations large and small to create the Kentucky Black Farmer Fund.

**Women, Food, and Agriculture Network** (WFAN) was founded in 1997 with a mission to engage women in building an ecological and just food and agricultural system through individual and community power. WFAN is a national organization, with women and non-binary members across the United States. Delaying debt relief for our BIPOC farmer-members compounds the challenges that they regularly face, particularly during the pandemic, which hit these communities exponentially harder. WFAN believes in the maxim that "justice delayed is justice denied," and supports the immediate release of these much-needed relief funds.

**Steward Holdings** (Steward) is a private lending partner offering commercial loans and expert support services to regenerative farmers, ranchers, fishermen, and producers so they can expand and sustain their businesses. Steward currently works with over 100 human-scale regenerative farmers, ranchers, fishermen, and producers across the United States. Each day that relief under Section 1005 is delayed only adds to the economic burden being shouldered by farmers we work with, causing additional harm to them, their families, and their communities.

8

# INTRODUCTION

A preliminary injunction in this case will unnecessarily deprive minority farmers of debt relief, compounding harm from decades of racial discrimination and the COVID-19 crisis. The American Rescue Plan Act (ARPA) was signed into law on March 11, 2021. Section 1005 of the ARPA provides direct, emergency debt relief for socially disadvantaged farmers and ranchers, to ensure their survival in the wake of the COVID-19 crisis. Congress recognized that minority farmers were already operating at a disadvantage when the COVID-19 pandemic struck, and needed immediate support. Accordingly, the legislation authorized the U.S. Department of Agriculture (USDA) to spend "sums as may be necessary" to relieve certain debt burdens for socially disadvantaged producers. Pub. L. No. 117-2, § 1005(a)(1) (2021).[1]

Longstanding federal law defines "socially disadvantaged farmer or rancher" as "a member of a socially disadvantaged group . . . whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." 7 U.S.C. § 2279(a)(5)–(6). In its Notice of Funds Availability, USDA explained that such groups "include, *but are not limited to*: American Indians or Alaskan Natives; Asians; Blacks or African Americans; Native Hawaiians or other Pacific Islanders; and Hispanics or Latinos."[2]

Plaintiffs seek a preliminary injunction to forestall implementation of Section 1005, arguing that relief to socially disadvantaged farmers and ranchers amounts to a constitutionally impermissible racial classification. But Supreme Court precedent is clear that Congress may employ race-conscious measures if needed to address a compelling government interest, s*ee, e.g.,*

---

[1] *See also* USDA Notice of Funds Availability (NOFA), https://public-inspection.federalregister.gov/2021-11155.pdf (noting that USDA "received emergency approval" from Office of Management and Budget for ARPA information collection).

[2] *See* NOFA, *supra* note 1, at 6 (emphasis added).

*Grutter v. Bolinger*, 539 U.S. 306, 326–27 (2003), and the balance of harms weighs strongly against injunctive relief.

As discussed below, Section 1005 is a measured response to past and present discrimination in USDA's programs, and the disproportionate impact of the COVID-19 pandemic on the nation's most vulnerable farmers. Having been underserved by prior USDA lending and aid programs, socially disadvantaged farmers are relying on Section 1005 to meet their farming needs this season, and will be irreparably harmed if the promised assistance is delayed or denied.

## ARGUMENT

I. **Congress Enacted Section 1005 to Address <u>Two</u> Compelling Government Interests: Remedying Discrimination Against Minority Farmers, and Ensuring that COVID-19 Relief Reaches Those Most Impacted by the Crisis.**

"The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995).

In crafting Section 1005, Congress was acting in response to *two* compelling, appreciable problems that have particularly disadvantaged minorities: a clear and persistent pattern of racial and ethnic discrimination in USDA's loan and assistance programs, and the disproportionate economic impact of the COVID-19 pandemic on minority farmers, which threatens to perpetuate the lingering effects of USDA's discriminatory practices.

A. ***Minority farmers have been harmed by persistent discrimination in the USDA's farm loan programs.***

The Supreme Court has recognized that the government has a compelling interest in "remedying the effects of past or present racial discrimination." *Shaw v. Hunt*, 517 U.S. 899, 909 (1996). And as government officials have acknowledged in this case, it is "no secret" that the

USDA's loan programs "have historically been infected by discrimination against minority farmers."[3]

Through its Farm Service Agency (FSA) and, formerly, Farmers Home Administration (FmHA), the USDA has operated as the "'lender of last resort' to small farmers — a source of direct farm financing for those borrowers who cannot obtain credit elsewhere."[4] But minority farmers have often been excluded from the benefits of this assistance. In various fora over the last four decades, including congressional hearings,[5] civil rights reports,[6] and class action litigation,[7] minority farmers have decried unfair and discriminatory lending practices in USDA programs. Such practices include failing to provide minority farmers with loan program information and applications;[8] awarding minority farmers smaller loans, at higher interest rates, than white farmers;[9] frequent delays in processing loans for minority farmers;[10] applying minority farmers'

---

[3] Doc. 17, p. 4.

[4] *Decline of Minority Farming in the United States: Hearing Before the Gov't Just., Info., & Agric. Subcomm. of the H. Comm. on Gov't Operations*, 101st Cong. 27 (July 25, 1990) (statement of David Harris, Jr., Executive Director, Land Loss Prevention Project), https://www.google.com/books/edition/Decline_of_Minority_Farming_in_the_Unite/XdD4pV3tgeEC?hl=en&gbpv=1.

[5] *See, e.g.*, *Management of Civil Rights at the USDA: Hearing Before the Subcomm. On Gov't Mgmt., Org., & Procurement of The H. Comm. On Oversight And Gov't Reform*, 110th Cong. (May 4, 2008), https://www.google.com/books/edition/Management_of_Civil_Rights_at_the_USDA/uU-8FKm6V3cC?hl=en&gbpv=0.

[6] *See, e.g.*, U.S. Comm'n on Civil Rights, *The Decline of Black Farming in America* 85–134 (1982), https://files.eric.ed.gov/fulltext/ED222604.pdf.

[7] *See, e.g.*, *Keepseagle v. Veneman*, No. Civ.A.9903119EGS1712, 2001 WL 34676944 (D.D.C. Dec. 12, 2001) (class action of Native American farmers); *Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999) (class action of Black farmers); *see also Garcia v. Veneman*, 224 F.R.D. 8 (D.D.C. 2004) (putative class of Hispanic farmers).

[8] *See* U.S. Comm'n on Civil Rights, *supra* note 6, at 87.

[9] *See id.;* Exhibit H, p. 2 (Statement of Rural Coalition to the H. Comm. on Agric. Hearing on the State of Black Farmers (March 25, 2021)).

[10] *See* U.S. Comm'n on Civil Rights, *supra* note 6, at 87.

loan payments to the wrong accounts;[11] and accelerating minority farmers' loans without explanation.[12]

Amici represent thousands of minority farmers, many of whom have directly suffered economic injury due to discriminatory practices in the administration of USDA's loan programs. For instance, Alfonso A. Abeyta, a Latino rancher in Antonito, Colorado, has a 400-acre ranch where he raises sheep and cows.[13] He recalls several painful instances of discrimination by USDA representatives. When he first sought a USDA loan to own and operate a ranch, a USDA employee told him that "Mexicans were more suited to being farm workers, not farm owners."[14] He later attempted to take out USDA loans because of several natural disasters. However, USDA representatives denied his applications because he and his family worked other jobs to supplement their income.[15] To Mr. Abeyta's knowledge, white farmers in his area have routinely been able to take out USDA loans even though they worked outside of their ranches.[16] He estimates that his losses from USDA lending discrimination are in excess of $2.9 million.[17]

Nathaniel Bradford is a Black farmer and rancher from Creek County, Oklahoma, who has worked in agriculture for 30 years.[18] He has been repeatedly discriminated against by FSA offices

---

[11] *See Decline of Minority Farming*, *supra* note 4, at 9 (statement of Congressman Mike Espy of Mississippi).

[12] *Id.*

[13] *See* Exhibit A (Declaration of Alfonso A. Abeyta), ¶¶ 3–4.

[14] *Id.* at ¶ 7.

[15] *Id.* at ¶ 9.

[16] *Id.*

[17] *Id.* at ¶ 8.

[18] *See* Exhibit B (Declaration of Nathaniel Bradford), p. 1.

in neighboring Payne and Okfuskee Counties.[19] For the past 15 years, he has been repaying an FSA loan without adequate servicing.[20] Last year, he applied for a new FSA loan to replace a 100-year-old barn.[21] Instead of giving him a loan to build a new barn, FSA appraised the old, derelict barn at $30,000, and told Mr. Bradford that he would need to pay the full amount in order to remove USDA's lien.[22]

In enacting Section 1005, Congress took action in response to a longstanding and well-documented pattern of discrimination against minority farmers in USDA programs. As Section 1005 authorizes USDA to remedy discrimination that is "traceable to its own actions," the relief afforded to socially disadvantaged farmers is clearly appropriate under existing Supreme Court precedent. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 288 (1986) (O'Connor, J., concurring in part and concurring in the judgment).

### B. Minority farmers' precarious financial circumstances have been exacerbated by the COVID-19 pandemic.

When crafting Section 1005, Congress not only grappled with USDA's extensive history of racial discrimination, but also confronted the devastating economic impact of the COVID-19 pandemic on already struggling minority farmers. Researchers have identified clear racial disparities in the impact of COVID-19: minorities are more likely to lose jobs and wages due to the pandemic;[23] and Black, Hispanic, and Native American people are approximately three times

---

[19] *Id.*

[20] *Id.* at p. 2.

[21] *Id.*

[22] *Id.*

[23] *See* Nishesh Chalise & Violeta Gutkowski, *How COVID-19's Economic Impact Varies by Geography and Race*, Federal Reserve Bank of St. Louis: Open Vault Blog (April 21, 2021), https://www.stlouisfed.org/open-vault/2021/april/how-covid-19-economic-impact-varies-by-geography-and-race; Mark Hugo Lopez et al., *Financial And Health Impacts Of COVID-19 Vary Widely By Race And Ethnicity*, Pew Research Center (May 5, 2020),

13

as likely to be hospitalized, and twice as likely to die, from COVID-19 infection.[24] While minority farmers have been disproportionately impacted by the pandemic, prior COVID-19 relief through USDA has failed to reach many of them.[25] Nearly 97% of the $9.2 billion appropriated through USDA's Coronavirus Food Assistance Program (CFAP) went to white farmers.[26]

Amici represent minority farmers who have been impacted by COVID-19, but received little or no relief under previous USDA pandemic assistance programs. For instance, Mr. Bradford tried to participate in CFAP, but was subjected to extra processes and scrutiny relative to white farmers.[27] Other Black farmers he knows were treated similarly, and Mr. Bradford believes that such roadblocks to participation were initiated by FSA county committees.[28] As a result, white farmers received more government support, including emergency assistance.[29]

Leroy Brinkley, Jr., is a Black rancher who lives in Haskell, Oklahoma.[30] He has operated his 80-acre ranch for 23 years.[31] Both his family and business suffered due to COVID-19. Mr. Brinkley, his wife, and his two-week-old granddaughter all contracted COVID-19.[32] The entire

---

https://www.pewresearch.org/fact-tank/2020/05/05/financial-and-health-impacts-of-covid-19-vary-widely-by-race-and-ethnicity/#:~:text=3The%20COVID%2D19%20economic,according%20to%20the%20April%20survey.

[24] Centers for Disease Control and Prevention, *Risk for COVID-19 Infection, Hospitalization, and Death by Race/Ethnicity* (updated May 26, 2021), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html.

[25] Jared Hayes, *USDA Data: Nearly All Pandemic Bailout Funds Went to White Farmers*, Environmental Working Group (Feb. 18, 2021), https://www.ewg.org/news-insights/news/usda-data-nearly-all-pandemic-bailout-funds-went-white-farmers.

[26] *Id.*

[27] *See* Exhibit B, p. 2.

[28] *Id.* at pp. 2–3.

[29] *Id.* at p. 3.

[30] *See* Exhibit C (Declaration of Leroy Brinkley, Jr.), ¶ 3.

[31] *Id.* at ¶ 4.

[32] *Id.* at ¶ 8.

family had to quarantine apart from each other for 21 days, and his wife was hospitalized for nine days. Due to the pandemic, Mr. Brinkley could not work for two months, and was only able to work part-time for nearly a year.[33] His ranch was impacted as well, due to lost customers, and higher costs for feed, fuel, and production. Mr. Brinkley hopes to use the debt relief from Section 1005 to cover his losses related to COVID-19.

Henry Brown, a 71-year-old Black farmer, found prior COVID assistance programs impossible to navigate to his benefit.[34] His cow-calf business experienced significant income loss during the pandemic.[35] In addition, from March 2020 to February 2021, his off-farm household income decreased by $2,200 per month, due to economic costs associated with the COVID-19 pandemic.[36] Mr. Brown made a successful application to the Small Business Administration (SBA) for an Economic Injury Disaster Loan to help with his farm.[37] But he was ultimately penalized by USDA for participating in SBA's coronavirus relief program.[38]

By providing debt relief to the most disproportionately impacted farmers, who were largely left out of prior COVID assistance, Section 1005 lawfully redresses the "persistence" and "lingering effects" of discrimination in USDA's loan programs. *Adarand*, 515 U.S. at 237.

Congress has spent decades receiving and reviewing complaints from minority farmers, holding hearings on and studying the problem of racial discrimination in USDA's programs, and relying on race-neutral alternatives that have proven ineffective in remedying the harm of past and

---

[33] *Id.*

[34] *See* Exhibit D (Declaration of Henry Brown).

[35] *Id.* at ¶ 5.

[36] *Id.* at ¶ 7.

[37] *Id.* at ¶ 8.

[38] *Id.* at p. 3.

present USDA discrimination. *Cf. Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 970 (8th Cir. 2003) (approving race-conscious measures where "Congress has spent decades compiling evidence of race discrimination in government highway contracting, of barriers to the formation of minority-owned construction businesses, and of barriers to entry"). In enacting Section 1005, Congress was also taking urgent action to support the continued viability of minority farmers, who were already economically distressed, due in part to longstanding discrimination in USDA's programs, and whom evidence confirms are disproportionally impacted by COVID-19.[39] As there is a "strong basis in the evidence" to support Section 1005, and compelling government interests are implicated, the debt relief to socially disadvantaged farmers is constitutionally permissible. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989) (citation omitted).

## II. Section 1005 Is a Narrowly Tailored Measure, Employing the Least Restrictive Means to Achieve Congress's Policy Goals.

The government's consideration of race must be narrowly tailored to further its compelling interests. *Croson*, 488 U.S. at 507. Although "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative," it does "require serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339. Reviewing courts should also consider "the flexibility and duration of the relief" provided. *United States v. Paradise*, 480 U.S. 149, 171 (1987).

### A. Race-neutral efforts have been attempted, and failed to remedy the effects of USDA's long and persistent history of discrimination.

Discrimination based on race and ethnicity has been pervasive in USDA's programs for decades.[40] In response to complaints about discriminatory and arbitrary implementation, USDA

---

[39] *See supra* notes 23–25.

[40] *See, e.g.*, Exhibit H (Statement of Rural Coalition to the H. Comm. on Agric. Hearing on the State of Black Farmers (March 25, 2021)).

16

has engaged in a series of race-neutral reforms and actions, discussed below, but these changes have been insufficient to overcome continuing harms from past and present discrimination.

First, USDA Farm Loan Programs are themselves an example of race-neutral efforts to expand opportunity for farmers. Access to credit is a routine barrier for socially disadvantaged farmers, and congressional efforts to expand credit access for farmers began decades ago. USDA eventually created farm loan programs that target disadvantaged farmers.[41] To get a loan, farms must be of a modest size, that is to say "family farms;"[42] applicants must have been unable to get credit anywhere else;[43] strict loan limits apply; and officials' wide latitude in making loans was tightened with voluminous rules designed to make lending more fair. If any race-neutral and targeted program for credit scarcity is imaginable, this is it. Nevertheless, "SDFRs received proportionately fewer loans and less agricultural credit overall than non-SDFRs."[44]

Aid programs are also administered in a race-neutral manner. In practice, such programs perpetuate inequality, because the race-neutral formulas fail to account for important differences in the circumstances, accessibility, and needs of socially disadvantaged farmers. For instance, an aid program that provides a set dollar figure per acre[45] may meet the needs of farmers with large holdings, but farmers with small acreages — which describes most minority farmers[46] — often

---

[41] *Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited*, U.S. Gov't Accountability Off., 13 (July 2019), https://www.gao.gov/assets/gao-19-539.pdf.

[42] *See FSA Farm Loan Programs*, U.S. Dep't of Agric., https://www.fsa.usda.gov/programs-and-services/farm-loan-programs/.

[43] *See* U.S. Comm'n on Civil Rights, *supra* note 6, at 76.

[44] *Agricultural Lending*, *supra* note 41, at 20.

[45] *See, e.g.*, *USDA to Provide Additional Direct Assistance to Farmers and Ranchers Impacted by the Coronavirus*, U.S. Dep't of Agric. (Sept. 18, 2020), https://www.usda.gov/media/press-releases/2020/09/18/usda-provide-additional-direct-assistance-farmers-and-ranchers.

[46] *See Lending to Farmers of Color and Women: New Report Examines Trends And Barriers*, Nat'l Sustainable Agric. Coalition (Aug. 27, 2019), https://sustainableagriculture.net/blog/gao-report-lending-sdfr/.

receive too little relief to meet their costs and expenses. The CFAP, for example, afforded the average white farmer $3,398, whereas the average Black farmer received $422.[47]

USDA reformed its county committee system, created decades ago, in an effort to provide accountability and fairness in USDA programs in a race-neutral way. County committees are elected by local farmers to make important decisions in the local implementation of USDA programs.[48] Given the realities on the ground, this race-neutral approach to USDA accountability itself became an instrument of discrimination.[49] Seeking a race-neutral solution, in a series of reforms, USDA has transformed the county committee system to make it less powerful and more representative of the whole farming community.[50] But this race-neutral approach has flatly failed to provide racial equality in USDA programs.[51]

Lastly, in response to longstanding complaints that farmers had no means of reversing arbitrary and discriminatory decisions, USDA created an elaborate appeals system, the National Appeals Division (NAD), in 1994.[52] NAD allows farmers to appeal any adverse decision to a relatively autonomous decisionmaker. While NAD may have improved accountability within

---

[47] *See* Hayes, *supra* note 25.

[48] *See Farm Service Agency County Committees: In Brief*, Cong. Rsch. Serv. (Jan. 29, 2021), https://www.everycrsreport.com/files/2021-01-29_R40179_111b8ebb8c5a99b497fb6c42c31be43a9681924a.pdf.

[49] *See* Susan Youngblood Ashmore, *Carry It On: The War on Poverty and the Civil Rights Movement in Alabama 1964–1972*, 81, 140–52 (2008), https://www.google.com/books/edition/Carry_it_on/SSdp-dtMM1sC?hl=en&gbpv=0; *see also* Pete Daniel, *Dispossession: Discrimination Against African American Farmers in the Age of Civil Rights* (2013).

[50] *See* Farm Security and Rural Investment Act of 2002, § 2501A, https://www.congress.gov/107/plaws/publ171/PLAW-107publ171.pdf; *see also Farm Service Agency: County Committee Elections 2001*, U.S. Dep't of Agric., https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/coc_elections-fact_sheet.pdf.

[51] *See, e.g.*, Exhibit B, pp. 2–3.

[52] *See* Department of Agriculture Reorganization Act of 1994, Subtitle H, 7 U.S.C. §§ 6991–7002.

USDA, it has done nothing to address discrimination. A farmer, for example, is not even allowed to raise discrimination as an issue in a NAD hearing.[53]

As USDA officials have acknowledged in this case, "[t]he necessity of the debt relief in § 1005 is underscored by the inefficacy of the race-neutral alternatives that Congress used before enacting § 1005."[54]

### B. Relief under Section 1005 will benefit the most vulnerable and underserved farmers: those impacted by USDA discrimination and at the greatest risk of failure.

Amici advocate for policies that will level the playing field for small farms and socially disadvantaged farmers and ranchers. A remedy for USDA discrimination should do several things. First, it should identify actual farmers who have struggled to succeed in farming. Second, it should target farmers who have participated directly in USDA programs, especially USDA loan programs, because that is where the most thorough record of discrimination exists. Third, the remedy should do something tangible that benefits the farmer, is directly related to the discrimination at hand, and makes that farm more likely to succeed.

Section 1005 meets all three of these criteria.

First, all recipients of relief are actual farmers. USDA farm loan regulations require that Farm Loan Program recipients be farmers when the loan is closed.[55] They can be relatively new farmers, but every loan recipient is an actual farmer. Further, these operations are all large enough to be considered farms, and not just rural residences or tiny homesteads with a small garden.[56] In

---

[53] *See Common Questions Related to Appeals*, U.S. Dep't of Agric., https://www.nad.usda.gov/content/common-appeal-related-questions.

[54] Doc. 17-1, p. 33.

[55] *See Your Guide to FSA Farm Loans*, U.S. Dep't of Agric., 17–21, https://www.fsa.usda.gov/Internet/FSA_File/fsa_br_01_web_booklet.pdf.

[56] *Id.* at 70.

addition, the farms receiving relief are of modest size. USDA rules require that they be no larger than a family farm — mainly defined as the borrower doing a large proportion of the work on the farm.[57] None of the recipients of a USDA farm loan, in other words, is a massive farming operation that is in no danger of failure.

Second, because each loan recipient can only receive the loan if the farmer could not get the loan anywhere else,[58] we know that these farms are in danger of being lost due to lack of credit, repossession, foreclosure, bankruptcy or some other financial catastrophe.

Third, we know that these socially disadvantaged farmers — actual borrowers with USDA loans — have faced the brunt of ongoing, well-documented discrimination. These farmers may get loans, but get them late, making successful farming all but impossible.[59] They get loans of smaller amounts than are needed and provided for in the rules.[60] USDA places unreasonable restrictions on the loans and requires more collateral than is justified, thus making additional credit difficult to get.[61] If the farmer has difficulty repaying the debt, USDA rushes to accelerate, repossess, foreclose,[62] and does not use the wide panoply of loan servicing options — including debt write-

---

[57] *See id.*

[58] *See Agricultural Lending*, *supra* note 41, at 13.

[59] *See Decline of Minority Farming*, *supra* note 4, at 9 (statement of Congressman Mike Espy), 20 (statement of David Harris, Jr.).

[60] *See Decline of Minority Farming*, *supra* note 4, at 61, 97 (statement of Randi Ilyse Roth, Staff Attorney, Farmers' Legal Action Group).

[61] *See Management of Civil Rights*, *supra* note 5, at 24–26 (testimony of Guadalupe L. Garcia Jr.).

[62] *See id.* at 12 (statement of John Boyd, President, Nat'l Black Farmers Assoc.), 22 (testimony of Guadalupe L. Garcia Jr.).

downs — that the farmers are entitled to when experiencing payment difficulties, and which seem so widely available to white borrowers.[63]

Further, we know that ongoing debt is the most likely way a farm will be lost.[64] Behind virtually every farm collapse is a debt crisis. By relieving the debt, this USDA program provides a precise remedy to help socially disadvantaged farmers survive.

### C. Section 1005 provides temporary relief in response to the exigencies of the COVID-19 pandemic.

In crafting a relief program for the most vulnerable farmers, Congress also had to consider their urgent financial needs in the context of typically rigid farming schedules.[65] Section 1005 is the most narrowly tailored approach that could deliver relief rapidly during the pandemic (in time to help farmers this season), and without creating problematic barriers to participation (as a grant application process would).

Given the inefficacy of race-neutral attempts to redress the impact of discrimination within USDA, and the urgent need to extend temporary aid to the most vulnerable farmers impacted by the COVID-19 pandemic, Congress's race-conscious measure in Section 1005 is appropriate.

### III. The Balance of Harms Weighs Strongly Against a Preliminary Injunction, Because Minority Farmers and the Public Will Be Harmed, But Plaintiffs Are Not Harmed.

If the Court enjoins Section 1005, socially disadvantaged producers will be further and irreparably harmed financially, which will have devastating impacts on their operations,

---

[63] *See Civil Rights at the U.S. Department of Agriculture (C.R.A.T. Report)*, U.S. Dep't of Agric. Civil Rights Action Team, 22, 26 (Feb. 1997), https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1997-crat-report.pdf.

[64] *See* J. Rabin, *Excess Farm Indebtedness: Not a Sustainable Practice*, Rutgers Cooperative Extension: Sustainable Farming on the Urban Fringe (Oct. 15, 2010), https://sustainable-farming.rutgers.edu/excess-farm-debt-not-sustainable/.

[65] *See, e.g.*, *Monthly Crop Stage Calendars*, U.S. Dep't of Agric., https://ipad.fas.usda.gov/ogamaps/cropmapsandcalendars.aspx.

customers, families, and communities. Both historic and continued racial discrimination has put them in precarious financial positions that have been exacerbated by the COVID-19 pandemic. As earlier pandemic relief did not reach or have a substantial positive impact on these producers, their financial positions worsened relative to their peers. Congress enacted Section 1005 to provide needed relief to socially disadvantaged farmers, recognizing that if action were not taken soon, they would face irreversible harm.

### A. Discrimination in lending has made it more difficult for minority farmers to survive times of crisis.

In few other industries is regular infusion of capital, borrowed at fair terms, so necessary to success as in agriculture. Discriminatory practices against minority farmers — particularly in agricultural lending — have forced minority farms and ranches into foreclosure or hampered the economic viability of their operations. USDA has acknowledged that "minority farmers have lost significant amounts of land and potential farm income as a result of discrimination by FSA programs and the programs of its predecessor agencies, ASCS and FmHA."[66]

Decades of discrimination in lending have set minority farmers up for failure, particularly in times of extreme crisis like a global pandemic. In enacting Section 1005, Congress took this long history of discrimination in lending, and its continuing effects during the coronavirus pandemic, into account. In the committee report accompanying H.R. 1319, Congress explained:

> The USDA spends billions of dollars annually to provide crucial support to American agricultural producers. Black farmers and other agricultural producers belonging to racial or ethnic minority groups have received a disproportionately small share of the farm loans and payments administered by USDA as a result of the longstanding and widespread discrimination against these groups. Despite multiple lawsuits, numerous government reports, and the limited programs created by Congress since the 1980s attempting to address the disproportionately low rates of agricultural spending on socially disadvantaged groups, USDA farm loan and payment programs continue to disproportionately benefit farmers who are not racial

---

[66] See C.R.A.T. Report, supra note 63, at 6.

or ethnic minorities. Consequently, the Committee has agreed to achieve its directed spending target by using a tailored approach to increase spending to address these longstanding inequities.[67]

### B. Delay in delivering debt relief will irreparably harm minority farmers.

Enjoining Section 1005 and denying needed debt relief to minority farmers would destabilize the farm sector as a whole. The immediate harm would not be borne by the Plaintiffs, but rather by the over 250,000 minority farmers this relief was designed to protect. They have already suffered disproportionately from the COVID-19 pandemic, and delaying or denying debt relief while the world is still in the midst of the pandemic would only exacerbate those impacts. The devastating market impacts of the pandemic on American agriculture have already been exceptionally disastrous for minority farmers, as the pandemic has compounded negative externalities from decades of discriminatory lending practices.

These deep impacts on minority farming operations include production to processing gaps, market closures, and loss of sales, all of which result in an inability to generate profit and repay debt. In a survey conducted by amicus curiae Intertribal Agriculture Council (IAC),[68] 86 percent of the Tribal producers who responded have been negatively impacted by the COVID-19 pandemic; 85 percent stated the need for financial assistance and support as a result of the pandemic; and 79 percent reported a production to processing gap.

Amici represent struggling minority farmers who have relied on the Government's assurances of debt relief, and will be harmed if this needed assistance is withheld. For instance, Mr. Bradford's ranch is already in serious jeopardy because of past due balances and delayed farm

---

[67] *Rep. of H. Comm. on the Budget to Accompany H.R. 1319*, 12 (Feb. 24, 2021), https://www.congress.gov/117/crpt/hrpt7/CRPT-117hrpt7.pdf.

[68] *See Covid-19 Preliminary Survey Results*, Intertribal Agric. Council, https://www.indianag.org/post/covid-19-preliminary-survey-results.

and ranch activities stemming from the pandemic.[69] He has made plans for his farm based on the promise of loan forgiveness, putting all of his family's savings into keeping the farm going.[70] If Mr. Bradford does not receive debt relief through Section 1005, he will go bankrupt.[71]

Jane Doe is an Asian poultry farmer in North Carolina.[72] She is also a refugee.[73] She owes hundreds of thousands of dollars in loans which were used to start her family's poultry business.[74] Since her husband's death, she has struggled to manage the farm on her own.[75] The pandemic has caused delays with processing facilities, which have been harmful to her business, and she has been denied participation in aid programs.[76] If she does not receive debt relief through Section 1005, she will not be able to keep the farm going for much longer, and she fears that she will be financially taken advantage of as a widowed, female farmer.[77]

Additionally, without debt relief through Section 1005, debt-to-income ratio restrictions will prevent many socially disadvantaged farmers from obtaining the lending they need to plant and harvest their crops and maintain their farms this season.[78]

---

[69] *See* Exhibit B, p. 3.

[70] *Id.*

[71] *Id.*

[72] *See* Exhibit E (Declaration of Jane Doe), ¶¶ 2–5. Ms. Doe uses a pseudonym due to concerns about retaliation.

[73] *Id.* at ¶ 5.

[74] *Id.* at ¶ 7.

[75] *Id.* at ¶ 11.

[76] *Id.* at ¶¶ 10, 12.

[77] *Id.* at ¶ 15.

[78] *See, e.g.,* Exhibit B, p. 3; Exhibit F (Declaration of George McNary III), ¶ 13; Exhibit G (Statement of Cassandra P.), pp. 2–3. Ms. P. uses a pseudonym due to concerns about retaliation.

### C. *Delaying assistance to minority farmers is also harmful to the public interest.*

Without equitable access to credit, farms and ranches simply cannot survive; without profitable farms and ranches and the related businesses they help sustain, the American economy suffers.[79] American Indian and Alaska Native farmers alone produce $3.5 billion in raw market value of agricultural commodities annually, according to the National Census of Agriculture.[80] Black farmers produce $1.4 billion annually.[81] Hispanic farmers produce $21 billion annually.[82] All told, approximately 250,000 socially disadvantaged farmers and ranchers contribute $26 billion to the U.S. economy each year, and this is despite carrying a disproportionate amount of debt — an estimated $20 billion in farm debt[83] — and having less access to farm programs.

If socially disadvantaged farmers are unable to survive pandemic-related losses, that would otherwise be ameliorated by Section 1005 as Congress intended, a loss of that magnitude — after all the losses that the American economy broadly, and the American farm sector particularly, have had to bear since March 2020 — would have devastating economic consequences for all producers, not just those eligible for debt relief under Section 1005. The death of minority-owned farming operations undermines the entire American economy, imperils American farming and ranching

---

[79] *See Ag and Food Sectors and the Economy*, U.S. Dep't of Agric. Econ. Rsch. Serv. (noting that agriculture and related industries support 5.2% of the overall American GDP, accounting for $1.1 trillion annually and supporting 11% of total U.S. employment, with direct on-farm employment accounting for 2.6 million American jobs), https://www.ers.usda.gov/data-products/ag-and-food-statistics-charting-the-essentials/ag-and-food-sectors-and-the-economy/#:~:text=Agriculture%2C%20food%2C%20and%20related%20industries,about%200.6%20percent%20of%20GDP.

[80] *See American Indian/Alaskan Native Producers, 2017 Census of Agriculture: Highlights*, U.S. Dep't of Agric., 2 (ACH17-7/October 2019), https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_AmericanIndianAlaskaNative_Producers.pdf.

[81] *See Black Producers, 2017 Census of Agriculture: Highlights*, U.S. Dep't of Agric. (ACH17-9/October 2019), https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_Black_Producers.pdf.

[82] *See Hispanic Producers, 2017 Census of Agriculture: Highlights*, U.S. Dep't of Agric. (ACH17-10/October 2019), https://www.nass.usda.gov/Publications/Highlights/2019/2017Census_Hispanic_Producers.pdf.

[83] *See Agricultural Lending*, *supra* note 41, at 14.

writ large, and could potentially push the farm sector into another farm financial crisis like that of the 1980s. It is difficult to imagine a more compelling government interest than staving off total farm financial collapse.

Potential closure of minority farmers' agricultural operations would also have disastrous consequences for the American food system, particularly for those Americans who are relying on some form of food assistance in the wake of the pandemic-related economic downturn. Preliminary data from a survey of American Indian and American Native households conducted by the Native American Agriculture Fund and the Food Research & Action Center suggest a nearly 1500% rise in usage of federal food programs that connect individuals in need with American-grown or raised food, like the Farmers-to-Families Food Box. These food assistance programs are connected with local producers. In many Tribal communities, the closest local producers are socially disadvantaged farmers. Accordingly, enjoining debt relief will not only devastate these farms, but will also have a disproportionate impact on Tribal citizens' food systems.

### D. An injunction of Section 1005 would undermine Congress's goal of remedying ongoing inequities in USDA funding.

When Congress passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) on March 23, 2020, they fully recognized the threat facing agriculture. Nearly $9.2 billion was designated in the CARES Act for the Secretary of Agriculture to use to provide direct support to agriculture producers. The funding went overwhelmingly to white producers, making little to no impact on USDA's socially disadvantaged producers.[84]

Utilizing the CARES Act funding, USDA created a set of programs through the Coronavirus Food Assistance Program (CFAP): direct payments to producers and a Farmers-to-

---

[84] *See* Hayes, *supra* note 25.

Families Food Box Program (FFFB). Both programs did not provide adequate access or financial assistance to socially disadvantaged producers, exacerbating their precarious financial standings going into the pandemic.

In addition to the great disparity between who received and did not receive direct CFAP payments, it took USDA several months before making particular commodities produced by socially disadvantaged farmers and ranchers eligible for CFAP payments. In the first round of CFAP, which ran from April to September 2020, livestock made up more than 48 percent of the total payments.[85] However, bison, a major livestock category for Tribal nations, were not included. With livestock producers making up nearly 60 percent of all Tribal agriculture sales,[86] many producers went months without this funding.

Under the FFFB program, many socially disadvantaged producers did not have access to the program, and/or had their participation limited. Based on the structure of the program and outreach by USDA, very few Tribal producers, if any, were selected to be distributors/purchasers for the programs, and very few Tribal members sold into the program. Many found the requirements to get into the program difficult. Even when the FFFB program reached socially disadvantaged producers, that support was cut abruptly short. One award that went to an organization representing approximately 35 African American producers provided food boxes to predominately minority groups for two rounds of the program.[87] However, despite their demonstrated success, the organization was not provided an award for a third round.[88]

---

[85] *See Coronavirus Food Program 1 Data*, U.S. Dep't of Agric., https://www.farmers.gov/cfap1/data.

[86] *See American Indian/Alaskan Native Producers*, *supra* note 80.

[87] *An Evaluation of the Farmers to Families Food Box Program*, Harvard Law School: Food Law & Pol'y Clinic, 15 (Feb. 2021), https://www.chlpi.org/wp-content/uploads/2013/12/F2F-Food-Box-Report-Online-Final1.pdf.

[88] *Id*.

The totality of the history of past and present discrimination in USDA programs, including the ones created by USDA in response to the economic crisis facing America's agricultural producers, required the creation of Section 1005 to stave off an impending financial crisis for socially disadvantaged producers. Enjoining these payments would not only disregard congressional intent and a clear history of discrimination, but would also fail to acknowledge the current crisis facing minority farmers, who are desperately awaiting relief that has been consistently promised, but never delivered.

## CONCLUSION

Section 1005 is a constitutionally appropriate remedy for past and present discrimination in USDA's programs, enacted by Congress during a time of crisis that has disproportionally impacted minority producers. For the foregoing reasons, Plaintiffs' request for a preliminary injunction should be denied.

Date: June 23, 2021

Respectfully submitted,

/s/Keisha Stokes-Hough

Keisha Stokes-Hough (Miss. Bar No. 103717)
Alexandra M. Jordan (Ala. Bar No. 4624-X00X)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
Tel:     (334) 956-8200
Fax:     (334) 956-8481
keisha.stokeshough@splcenter.org
alexandra.jordan@splcenter.org

*Counsel for Amici Curiae*