EXHIBIT H

STATEMENT OF RURAL COALITION

# STATEMENT OF

## RURAL COALITION/COALICIÓN RURAL

### With

## Alabama State Association of Cooperatives
## Concerned Citizens of Tillery
## Cottage House, Inc.
## North Carolina Association of Black Lawyers Land Loss Prevention Project
## Oklahoma Black Historical Research Project, Inc.
## Operation Spring Plant, Inc.
## Rural Advancement Fund of the National Sharecroppers Fund

#### To the

## Committee on Agriculture
## U.S. House of Representatives

## For the Record of the Hearing on the State of Black Farmers Washington, DC
## Thursday, March 25, 2021

**For More Information Contact:**

John Zippert, RC Chairperson
Rural Coalition
Eutaw, Alabama
205-657-0274
Jzippert@aol.com

Lorette Picciano, Executive Director
Rural Coalition
1029 Vermont Avenue NW Suite 601
Washington, DC 20005
lpicciano@ruralco.org
202-628-7160, Direct: 703-624-8869
Website: **www.ruralco.org**

Savonala (Savi) Horne, ESQ, Executive Director
Savi@landloss.org
Land Loss Prevention Project
401 N. Mangum Street, 2nd Floor
Durham, NC 27701
Phone: (919) 667-8821
www.landloss.org

1

**Introduction**

Black farmers have been some of our nation's most vital stewards of the land, productive and industrious farmers, and resilient and determined producers. Remarkably, they have also used their farming and business acumen to produce more generations of farmers and landowners, schools, college graduates, separate business ventures, progressive community organizations, and more. Many black farmers and their communities thrived until they made the decision to acquire loans or other financing from the United States Department of Agriculture (USDA). The USDA was supposedly designed to help farmers in times of expansion, blight, and disasters. Yet, its racist lending and supervisory policies caused countless black farmers unwarranted stress and heart ache, debilitating illnesses, financial ruin, constant threats of government takeover, and premature deaths. Consequently, black farmers continue their more than century-old struggle for justice and equality from the U.S. government.

Matthew Grant (1918 – 2001) and Florenza Moore Grant (1921 – 2001) were farmers in Tillery, Halifax County, North Carolina. In the 1940s, they bought their family to the Tillery Resettlement Farms community under the federal Resettlement Administration that offered landless rural people an opportunity for hard work and survival. The Tillery Resettlement (Colored Section) was established as a segregated community with African American families like the Grants receiving smaller farms, smaller houses, and less farm equipment than their white neighbors. African American farmers were offered an opportunity to purchase land in the flood plain of the Roanoke River, while the White area of the Resettlement was out of the river's reach.

Toiling under the material and mental pressures of segregation, Matthew and Florenza raised a family and became leaders in their community. In the early 1970s, under pressures of mechanization of agriculture and competition from big agribusiness, they borrowed money under a U.S. Department of Agriculture (USDA) program that was supposed to help small farmers. They believed that unlike the local government, with its historical role in maintaining racial oppression, the federal program would be fair and supportive of a rapidly disappearing pillar in the nation – the African American family farmer.

By the late 1970s, the Grant family realized their hopes were misplaced. African American farmers were given smaller loans at higher rates than White farmers. In the spring, when White farmers were receiving funds to buy seed and fertilizer, African American farmers were still waiting for their loans. In the local Agriculture Department office, the Grants and their neighbors were told to wait until all White farmers had been seen first. They watched as checks were given out to Whites, only to be told that their money had not yet arrived. Loans to the Grants and other African American famers were closely supervised, requiring extra signatures and trips to the county seat before farm supplies could be purchased. These hard working, proud survivors of the rural south, farming land that their slave ancestors worked for plantation owners, were treated with disrespect and racial hatred.

Drought years and discriminatory practices prevented the Grants from repaying the loan during the 1970s. In 1981 they signed a Consent Judgment against their property in an agreement that the USDA would release farm equipment and the Grants would withdraw a discrimination

lawsuit. This according to the USDA was a "settlement of sorts" that would allow the Grants to continue farming and moving on with their lives, but the USDA refused to work with them on a means of repayment on the delinquent debt. Subsequently, Matthew and Florenza's children tried to "assume the debt," but their proposed monthly payment plan was not accepted. Matthew was actually told by the FmHA district director, "It does not matter who you go to see, who you bring or what you come up with, we are going to sale you out." Meanwhile, White farmers who had been affected by crop losses were given flexibility to settle their debts. Matthew and Florenza did not deny the debt, but they protested that their financial situation had been worsened by illegal racists practices.

In 1996, the USDA admitted that it had discriminated against the Grant family. However, they prevented the Grants from collecting the settlement that could have paid off their debt. Since that time the Grant family has worked without success to achieve a reasonable settlement with the government. Matthew and Florenza Moore Grant both died in 2001, six months apart from one another.

The Grant family requests that the USDA clear the Matthew and Florenza Moore Grant family debt, meet with our family to discuss an adequate settlement for years of discrimination and turmoil, and assist our family with starting an agricultural education fund for young students interested in farming and being stewards of the land.

**Cumulative Impact and Consequences of Discrimination**

Experiences such as that of the Grant family are not uncommon, when alternate financial arrangements are used to prevent permanent loss of land, especially when the underlying factor is discriminatory treatment by the government. The USDA has maintained that the Equal Credit Opportunity Act does not cover the impact of pain and suffering. The cumulative impact to the communities where these families farmed included a loss of feeling of good faith in any sort of debt settlement with the government. As a result, many farmers were unwilling to deal with USDA.

The Secretary and the Congress are urged first to hear their stories. As Section 1006 of the American Rescue Plan is implemented, we also urge that the Secretary consider how BIPOC who've taken over operations of their family farm can be given a release from prior debts as long as their debt arose out of some discriminatory actions. USDA and the Congress should take such action to assure that the cloud over the family is lifted so that the next generation farmers can participate in USDA programs on their own as new and beginning farmers. Their eligibility should not be barred because of a look back to debts of their parents or anybody else within their family who had the previous ownership of the farm.

The following excerpt from the introduction of the Statement by John Zippert that the Federation of Southern Cooperatives/Land Assistance Fund and the Rural Coalition to the U.S House of Representatives Committee on Agriculture Subcommittee on Conservation, Credit, Energy and Research on March 27, 2007 summarizes our past recommendation Congress, including issues that remain relevant today:

"Collectively, the Federation, and the Rural Coalition and its members and allies, have worked with thousands of farmers on the intricacies of their dealings with USDA and to seek structural change both administratively and in policy to assure equity and accountability in programs and services.

Over the past decade, we have supplied documents, analysis and testimony to the Civil Rights Action Team, the National Small Farms Commission, the US Congress and the US Civil Rights Commission. A half dozen of us served on the National Small Farms Commission, and we have also participated on other committees and in many sessions with the Secretary and the staff of the Department. We have led efforts to institute the USDA Partners meeting held annually for the past three years to allow USDA to develop relationships and understanding of the work and experience of its Community Based Organization Partners.

Our collaborative legal and legislative work included the 1987 Agriculture Credit Act, the Minority Farmers Rights Act of 1990 that was accepted as section 2501 of the 1990 Farm Bill, the 1994 Agriculture Reorganization Act, and collaborative efforts towards passage of the 1999 Waiver of the Statute of Limitations that removed a critical barrier to the settlement of the longstanding class action lawsuits. Over the years, we have also worked on disaster response, especially following hurricanes Katrina, Rita and Wilma.

We have also worked with this Committee on the most recent 2002 Farm Bill. We appreciate the support the members of this committee who helped assure that structural changes instituted to promote equity were included in that bill.

The average age of farmers continues to rise, especially among African American and other socially disadvantaged producers. For many years, inadequacies and inequities in programs and services have hastened the loss of African-American and other people of color owned farms. Access to credit is essential for all agricultural producers and those who aspire to be agricultural producers. This committee has the ability to take the actions needed to assure that new generations of people of color farmers and ranchers will have access to land and production.

In my years of work with the Federation of Southern Cooperatives/Land Assistance Fund, I have never met a black farmer who was not discriminated against. I believe the same is true for most of the diverse group of African-American, Latino, American Indian, Asian American and female farmers I have encountered within the Rural Coalition. As you well know, there remain issues surrounding the settlement of the Pigford v. Veneman and other still pending class action lawsuits against USDA that need to be addressed. We will provide a supplemental appendix for the record with updated statistics of the status of this settlement and on late claims.

For the past several months, our organizations have worked with a group of colleagues who represent a wide and diverse array of minority farmer and farmworker organizations called the Farm and Food Policy Diversity Initiative. As you begin your work on the 2007 Farm Bill, we share with you the collective wisdom of our organizations and our

partners on some essential changes that Congress can and should make in order to prevent the actions that necessitated legal action in the first place and assure transparency and accountability in the provision of services.

We want to help bring about the day when African American and other minority farmers can turn their attention to growing crops and revitalizing rural communities instead of filing complaints and lawsuits to secure the equitable service to which they are entitled in the first place.

Because of the cumulative effects of many years of discrimination and neglect, we are also proposing remedial measures and special services intended to reverse the impact of years of discrimination and neglect on many minority farmers. Our other recommendations include actions that can be taken to improve services to the many farmers who have suffered disasters in recent years, and some ideas on how to assure that new farmer programs will also serve socially disadvantaged producers."

We have also attached for the use of this Committee an extensive appendix of the research and policy recommendations Rural Coalition with our members have developed and shared over several decades. Central to this work especially as related to Black farmers were our founding members including the Rural Advancement Fund of the National Sharecroppers Fund (founded 1937) and the Federation of Southern Cooperatives/Land Assistance Fund (founded 1967), and members who have formed and joined since, including Concerned Citizens of Tillery, Cottage House, Inc., North Carolina Association of Black Lawyers Land Loss Prevention Project, Operation Spring Plant and Oklahoma Black Historical, and our allies and partners including Intertribal Agriculture Council and Arkansas Land and Farm Development Corporation and the National Family Farm Coalition and Farm Aid.

The attached Congressional Testimonies include the many policy recommendations we jointly made over the years to this committee and to the U.S. Senate since the first hearings in 2000. On the issue of credit, we have also attached numerous policy briefs related to Farm Credit, many authored by our Policy Advisor, Quinton Robinson, who in 2002 was the House Agriculture Committee staff member who organized the first hearing in the Subcommittee on Departmental Operations. Of particular relevance at present is the need for USDA Farm Services Agency to issue regulations to fully implement the Equitable Relief Provisions and the Heirs Property Relending Fund passed in the 2018 Farm Bill

Over these years, our team of collaborated have worked with the House and Senate Agriculture Committees to develop and promote passage of 40 sections passed in Farm Bills and related legislation since 1986. In those years, we worked with Rep. Edolphus Towns, whose staff member Brenda Pillars gave us access to a typewriter when the opportunity for a new amendment arose, including the amendment for matching grants for state mediation programs. The most extensive work began in the 1987 Agriculture Credit Act when discrimination by race and ethnicity was first defined in the context of federal Agriculture Policy.

It continued in section 2501 of the 1990 Farm Bill, which authorized the first program to tangibly support the organizations who serve black and other farmers who had suffered

discrimination, called the Outreach and Assistance for Socially Disadvantaged Farmers and Ranchers (OASDVFR). That statute for the first time that recognized the importance of this network of community-based organizations, including many who testified in this hearing, by making them eligible for grants and contracts. We will underscore the importance of the direct one-on-one technical assistance they have long been doing as a critical factor in stopping foreclosures and helping Black farmers hold onto their land.

We call particular attention to the aforementioned USDA Partners Process. Beginning in 2005 and continuing into the Obama Administration, this process convened a series of dialogues, or conversations, on critical barriers faced by BIPOC farmers and the community-based groups who served them with interagency teams of USDA career staff. The process was led by Shirley Sherrod and other CBO leaders. We estimate that as many as 500 people contributed over those 5 years. The comprehensive A Time to Change: A Report by the Assessment Conversations Team, Sept. 22, 2010 remains useful today both to measure progress and to identify additional changes. It was structured to identify problems, propose solutions including statutory changes needed, and also to describe what success would like. Many of the recommendations informed our proposals to you for the 2008 Farm Bill, and around 30 passed in the statute.

Since that time, many recommendations developed by the wide network of community-based organization who work directly every day with this nation's Black farmers and ranchers, and other Tribal, Latino, Asian Pacific, and other small-scale producers have been passed into law, with some implemented more fully than ever. We have also mobilized our communities to help lawmakers understand the degree of support for this proposals, including with sign on letters and collaboration with Members of Congress especially in Congressional Black and Hispanic Caucuses, including annual Dear Colleague Letters. One of the early ones was led by Rep. Sanford Bishop who for years led efforts to continually press for more funding for the 2501 Program, from $1 million to its present funding level. We will continue to work also with Secretary Vilsack and his team to assure these funds more effectively reach and support the eligible entities as defined by statute. We will be forwarding additional recommendations to you on how the full suite of Outreach, Beginning Farmer and Local Food programs can best complement each other.

 The drafting and action by this committee in this year of 2021 represents a historic and significant step forward in a new effort to begin to right some of the longstanding wrongs faced by Black farmers. We have attached for your record a copy of our March 3 sign on letter that we prepared to help support passage of the historic provisions included in the American Rescue Plan and a brief authored by our Policy Advisor on the relevant authorities supporting these provisions. We are deeply grateful to Chairman David Scott and the members of this committee, several of whom we have worked with for decades, for this action.

**Relevant Data and Research**

We are already working with USDA on the implementation of Sections 1005 and 1006 of the American Rescue Plan. As the committee's work of oversight continues and the preparation for the 2023 Farm Bill commences, we share additional proposals we are refining with our members and allies to support black farmers in securing land tenure for their families and generations into the future and restoring the agriculture as an economic base of their communities.

6

Particularly as the debate over climate mitigation begins, we will be highlighting the importance issue of land tenure. New investments of federal dollars over time have often favored larger scale farmers at the expense of others. But as the recent pandemic has shown us, crises such as these cause fundamental disruptions in existing food chains. Resiliency now and in the future point toward the value of reorienting the processing and distribution of food to shorter and more direct local and regional farm to food networks that are closer and more readily adaptable to serve the food needs of some of this nation's most vulnerable communities.

We will specifically address the issue of heirs property later in this piece. First, we thought it helpful to share a sampling of charts we have developed in connection with a research project under an Agriculture and Food Research Initiative project with the National Institute of Food and Agriculture. This AFRI standard research project, "*Community Resilience Through Land Tenure Rights,*" will examine the impacts of land tenure arrangements, non-ownership and related encumbrances on the management of small to medium-sized farm operations in a diverse cross section of socially disadvantaged agricultural communities. Rural Coalition and its co-principal investigators include both CBO's and researchers from Tuskegee University and Kansas State University and North Carolina Association of Black Lawyers Land Loss Prevention Project are co-Principal Investigators, with almost a dozen other CBO partners.

We will also use similar profiles in related research under a Sustainable Agriculture and Research grant, *Securing Land Tenure Rights for Heirs Property Owners.* The North Carolina Association of Black Lawyers Land Loss Prevention Project is Principal Investigator. The Rural Coalition and Tuskegee University and Virginia State University are Co-Principal Investigators along with multiple CBOs and Farmers in the Southern Region. The second grant focuses on the quality and availability of legal services.

These charts provide a snapshot of the trends in loss of land over time as far back as 1959 for Orangeburg County, SC. There also charts for Barber County, AL and Halifax County, NC. While there are specific issues with data at various points in time, we have found that the trends reflected are consistent with data we and others including the 1890 Universities have collected.

What the charts clearly provide is a sense of the cumulative impact of the past and in some places ongoing failure to address and halt discrimination. The result is the unjust and unnecessary loss of land by African American producers whose place on the land predates the arrival of many others in farming today.

**State of Black Farmers in the U.S. – Historic Land Tenure by County**



**Change in Farm Numbers, Orangeburg County, South Carolina (1950-2017)**



**Black/African American Land Tenure in Barbour County, Alabama, 1964-2017**



Net Cash Farm Income by Race in Barbour County, Alabama, 2007-2017



Black/African American Land in farms (acres) in Dale County, Alabama, 1969-2017

9





In almost every county we have already researched over several decades, land ownership has become more concentrated. Many farmers and ranchers have been unable to retain their land. The evidence of disparate treatment is particularly notable with respect to Black farmers and ranchers.

In collaboration with our farmer and rancher leaders, we organized several participatory research projects designed to better understand their views of USDA. The first was around issues related to participation in Crop Insurance programs. The second followed a series of farmer-led training we developed with our members. Our reports are included in the appendix, but the following charts provide a snapshot of how the needs of farmers overlap or diverge with the structure and operation of USDA programs and services.

**Table 1: Socio-Demographic Characteristics of Participants from Rural Coalition Financial Training Project (2004/2005)**

| Characteristic | Percent |
|---|---|
| Gender | |
|     Male | 67.5 |
|     Female | 32.5 |
| | (1048) |
| Race/Ethnicity | |
|     American Indian | 24.8 |
|     Asian American | 3.5 |
|     Black/African American | 54.9 |
|     White | 5.0 |
|     Hispanic/Latino | 10.7 |
|     Other | 1.1 |
| | (1052) |
| Highest Level of Education | |
|     Less than High School Degree | 29.6 |
|     High School Degree | 34.8 |
|     Some College, No Bachelor's Degree | 29.6 |
|     Bachelor's Degree or Higher | 6.0 |
| | (1050) |
| Total Farm Income (after expenses) in 2003 | |
|     Less than $4,999 | 54.0 |
|     $5,000 - $9,999 | 23.5 |
|     $10,000 - $19,999 | 13.9 |
|     $20,000 - $29,999 | 4.3 |
|     $30,000 or More | 4.3 |
| | (814) |

11

**Table 2: Farm Characteristics of Participants from Rural Coalition Financial Training Project (2004/2005)**

| Characteristic | Percent |
|---|---|
| Own Land | 84.5 (911/1078) |
| Rent Land from Others | 38.8 (409/1053) |
| Own *and* Rent Land | 28.1 (295/1048) |
| Acres in agricultural production in 2003* | |
|     Mean | 85.2 |
|     Median | 15.0 |
|     Minimum – Maximum | 0 – 2400 (937) |
| Acres in agricultural production in 2004* | |
|     Mean | 87.4 |
|     Median | 15.0 |
|     Minimum – Maximum | 0 – 2600 (935) |
| Produced Commodity Crops in 2003 or 2004 | 54.5 (561/1030) |
| Produced Fruits/Vegetables in 2003 or 2004 | 54.6 (553/1013) |
| Raised Livestock in 2003 or 2004 | 47.1 (480/1020) |
| Produced Commodity Crops, Fruits/Vegetables *and* Livestock in 2003 or 2004 | 14.3 (137/960) |

*Ranchers often did not include grazing acreage in their estimates of land in agricultural production. Therefore, the numbers presented here are conservative estimates.

**Table 3: Risk Management Strategies of Participants from Rural Coalition Financial Training Project (2004/2005)**

| Risk Management Strategy | Percent |
|---|---|
| Have Risk Management Plan | 4.7 (45/961) |
| Use a Tax Accountant | 42.7 (439/1029) |
| Make Use of IRS Form Schedule F | 18.6 (165/886) |
| Ever Purchased Crop Insurance | |
|     Yes, Currently Have Policy | 9.6 |
|     Yes, But No Current Policy | 5.8 |
|     No, Never | 84.6 (971) |

**Table 4: Labor Use of Participants from Rural Coalition Financial Training Project (2004/2005)**

| Risk Management Strategy | Percent |
|---|---|
| Spouse, Children or Other Family Members Receive Wages from Farm | 17.7 (154/869) |
| Number of Full-Time Employees | |
|     None | 85.4 |
|     1-10 | 14.0 |
|     11-20 | 0.3 |
|     21 or More | 0.3 (988) |
| Number of Regular Part-Time Employees | |
|     None | 80.6 |
|     1-10 | 17.9 |
|     11-20 | 0.9 |
|     21 or More | 0.6 (987) |
| Employed any Seasonal or Migrant Employees in the Past Year | 16.4 (127/773) |
| *Any Seasonal or Migrant Employees Participate in H2A Program* | *50.4 (64/127)* |
| Understand Tax Rules for Farm Labor | 14.5 (126/870) |

**Table 5: Awareness of and Participation in Government Programs Among Participants from Rural Coalition Financial Training Project (2004/2005)**

| Agency/Program | Percent Aware |
|---|---|
| Farm Services Agency Credit Programs | 52.5 (533/1015) |
| Farm Services Agency Disaster Payments | 54.4 (522/959) |
| Natural Resources Conservation Service | 48.7 (465/955) |
| Cooperative Extension Service | 58.1 (567/976) |
| Rural Development | 42.0 (400/953) |
| Risk Management Agency | 35.7 (335/939) |
| **Program** | **Program Participation** |
| Ever Applied for a Loan from USDA | 27.9 (234/839) |
| *Ever Been Denied a Loan from USDA* | *91.3 (210/230)* |
| *Ever Received a Loan from USDA* | *32.0 (72/225)* |
| Ever Received USDA Disaster Assistance | 36.2 (354/977) |
| Participate in any Annual Commodity Program | 13.5 (113/839) |
| Participate in any Conservation Program | 8.1 (84/1040) |

The farmer/mentors requested that we ask not only questions about the number of farmers who prepared schedule F of their tax return. Only 18.6 % said yes. They also wanted to know how many used tax preparers. 40% responded they did. Many of the groups who participated in this research continue to this day provide direct technical assistance to producers on the importance of good financial records, and the need also to provide required reports to document production and report losses.

These findings also underscore the importance of sustaining community-based organizations who are trusted by farmers for assistance in understanding and navigating USDA programs.

Also instructive is one chart from an earlier study which included a slightly different population of producers. We will have more to share as this committee begins work on the next farm bill and on climate issues. We looked at the level of participants in all types of insurance and these are our findings from the year 2002:

14

**Table 4. Insurance Use from Small, Limited Resource and Minority Farmers Survey**

| Variable | Frequency | Percent |
|---|---|---|
| **Currently use any form of insurance** | | |
| Respondents answering yes | 116 | 84.7 |
| | 137 | 100.0 |
| **Types of insurance used** | | |
| Health insurance* | 97 | 83.6 |
| | 116 | 100.0 |
| Dental insurance | 43 | 37.1 |
| | 116 | 100.0 |
| Accident insurance | 39 | 33.6 |
| | 116 | 100.0 |
| Life insurance | 74 | 63.8 |
| | 116 | 100.0 |
| Disability insurance | 29 | 25.0 |
| | 116 | 100.0 |
| Auto insurance | 100 | 86.2 |
| | 116 | 100.0 |
| General homeowner or renter insurance | 84 | 72.4 |
| | 116 | 100.0 |
| Disaster insurance | 25 | 21.6 |
| | 116 | 100.0 |
| General liability insurance for farm operation | 43 | 37.1 |
| | 116 | 100.0 |
| Crop insurance | 29 | 25.0 |
| | 116 | 100.0 |

We underscore the importance of the Farm Opportunities Outreach and Training Programs, including the Outreach and Assistance Program for Socially Disadvantaged Farmers and Ranchers. Our community-based organization members routinely accompany farmers the farmers we serve to USDA offices to make sure they are prepared to request services they need and to navigate USDA systems.

Our research findings highlight the need for improved connections and restoration of trust with USDA. Our organizations led efforts to establish systems that would allow USDA to monitor how these systems are working. One particular recommendation as far back as the 2002 Farm Bill was to require the farmer be provided a Receipt for Service on each visit to the agency. Language in the 2008 required USDA to provide a Receipt upon request. Rep. (and now HUD Secretary) Marcia Fudge offered an amendment during the 2014 Farm Bill Mark-up which is now a statutory requirement whose validity is affirmed including in an Administrative Law Judge opinion on a farm appeal. We remind the committee that the required receipt for service is

not uniformly provided in all offices and farmers are still facing push back for asking or outright refusal of their request.

Just last evening, our Rural Coalition Board Member Barbara Shipman of Cottage House, Inc. in Ariton, Alabama shared this story. "I had one of my farmers to go into a particular NRCS office and FSA office to request assistance. The young lady threw and not only hit him in the face with his folder, but she also told him *"get out of the office and don't come back until you have three years' worth of farm records."* Let me tell you please - returning military members have PTSD so it didn't take the snap of a finger to get them in the military zone again so that's why I go with them. So, I ended up having to talk to State Director. He said he was going to get involved. He called back to say he did so and said I should have no problem with anybody else like that."

Mrs. Shipman, herself an Army veteran of the Gulf War, routinely welcomes recently returned service members from Fort Rucker to consider farming. This particularly newly returned Veteran had grown up on a farm and had a plan for producing pecans and goats.

She also recounted that she recently accompanied two farmers to visit four separate county offices to determine who was supposed to serve them. One was not open for a prescheduled appointment; another was closed. In the last office, the staff member agreed to get on the computer to ascertain the correct service center. She said it was closing time, but she could provide service there at another time. Barbara told her, "that's fine as long as he leaves here with two things – a letter of receipt for service that provides his farm and tract number and a copy of the technology map of where his land is located. Then in future all you have to do give the address and you can pull it down on the computer and print it all. When we walked out of the office, I told him that when you get ready to go back to the office you let me know. We will go together because that's what I do. I will walk him through how to get those things he wants, and I know he's in that computer system. He can't march over to the NRCS, no way, if he's not in the computer system in FSA, step number one." She works with 40-60 farmers every year to assure service is done right. Without her, "they'll just turn him away and they won't even tell them about the receipt for service and they will not tell him he's due a copy of that topology map of his land or get him a farm and tract number - because that farmer number goes on that letter receipt for something so when he goes in the next time he has to do his put his farm in tracking down in the system and it brings up his file right and then he should have access."

**Technical Service Providers and Community Based Organizations -** Mrs. Shipman has many other examples to share. Community based organizations need to have a sustained funding, perhaps in new ways, to assure the many CBO staff members who provide such services can be compensated, retained and prepare to train others to perform these services. They could form the foundation of a network of CBO based technical service providers with authority to work on technical assistance for both FSA and NRCS programs.

She and many of our other members, including Mr. Willard Tillman of the Oklahoma Black Historical Research Project, have the stressed the need for ongoing support in order to do the work necessary to help farmers and ranchers connect with USDA. They are also able to build relationships with service centers and assure farmers are able to do what they need to do. These CBO technical service provides are also provide the invaluable service of calling inadequate

service to the attention of USDA leaders at the state and national level, so immediate intervention can be made, with appropriate accountability. It is critical to set in place new policy to provide this kind of trusted technical support to help farmers, ranchers, forest land owners and their families secure land and rebuild local economies.

Technical Support Providers are now used extensively in conservation programs. Authority should be provided to allow these providers who work with CBO's to cover FSA programs also. This would help CBO's to build a sustainable network of next generation leaders trained by our skilled leaders who have supplied technical assistance to our farmer members for over 4 decades. We believe that such investments would improve family wealth, stabilize land values and secure a tax base with improvements to the education, public works and the economic situation of the whole community.

**Critical and Continuing Issues – County Committees**

Our early collaborative work began in 1997, when we convened a group to address the issue of Farm Service Agency County Committees. After a week of training and dialogue at USDA headquarters coordinated in cooperation with NRCS Chief Pearlie Reed and FSA Credit Director Lou Ann Kling, we examined voting patterns, and eligibility and access issues. Our members looked at county data of eligible voters and how many voted in county committee elections, and ballot counting procedures. We encouraged turnout with some results in subsequent years.

We have also examined over the past few decades the data systems of USDA and how transparency and accountability could be advanced with modification of these systems. In 2000, we prepared testimony for the Senate Committee on Agriculture where we were invited to testify by Senator Richard Lugar. This statement, which we have not located, was very similar to the one shared of the House hearing at the same time.

Senator Lugar, with Senator Blanche Lambert Lincoln and others, included language we recommended to assure transparency and accountability in USDA practices, including the collection and publication of data on the participate rates of producers in USDA programs by race, gender and ethnicity. These provisions were added and were updated in subsequent farm bills. More work is necessary to assure these are available to farmers and groups working with them at the county level. They are also essential to help the Secretary and his team to in a proactive way identify offices that are doing a good job, and offices where improvements or other action are needed.

For many years we urged USDA and the Congress to move from a complaint generated system of solving exclusions proactively instead of only after farmers had have to enter the long and risky process of appeals, civil rights complaints and litigation. We urge the Secretary to also engage the office of the Assistant Secretary for Civil Rights to have the ability to transform systems of analysis necessary to offset problems before the pose a barrier to more farmers.

We share the following story from our Rural Coalition newsletter of December 2000 which recounts the proceedings of the first Senate Agriculture Committee Hearing on Civil Rights in September that year.

# Senate Agriculture Committee Holds First Hearing on Civil Rights in Agriculture: RC Chair Zippert Testifies

On September 12, John Zippert, Chair of the Rural Coalition and Program Director of the Federation of Southern Cooperatives, testified on behalf of both organizations at a landmark Senate hearing on Civil Rights in Agriculture, convened and led by Agriculture Committee Chairman Senator Richard Lugar (R–IN). The results of research done by Rural Coalition Member groups in 1996 and 1997 were included in Zippert's statement and provided the most specific evidence the committee received to support farmers' contentions of long-standing problems of disparate treatment by the county committees that oversee most Farm Services Agency (FSA) programs.

The USDA Inspector General (IG) Roger Viadero gave impassioned testimony on the state of the complaints processing system at the Department, with supporting statements from the U.S. General Accounting Office. Viadero has posted on the IG Web page a complete county-by-county breakdown of complaints filed. He singled out the USDA Office of Civil Rights as the key barrier to USDA's civil rights record, but noted that he had studied FSA county committees and found no problems. He asked what could be wrong with the committees, because they are elected by farmers.

A diverse array of Senators then asked incisive and pointed questions of U.S. Department of Agriculture (USDA) witnesses. Senators Thad Cochran (R–MS), Kent Conrad (D–ND), and Blanche Lincoln (D–AR) joined Senator Lugar in seeking answers from USDA officials about Viadero's testimony: why USDA remained so slow to act on complaints and why civil rights office operations had not yet improved.

In response, USDA Assistant Secretary for Administration Paul Fiddick outlined his plan to professionalize the management of the civil rights operation with techniques he developed in his work in private sector businesses. He pointed in particular to his creation of a new career post in the Civil Rights office, that of Deputy Director, and he introduced David Widdingham, who is responsible for Operations. When the Senators asked Mr. Widdingham to recount his expertise for the job, he responded that he had been the long-time Director of Civil Rights for the FSA. The USDA employees who testified later had to explain to the Senators why the audience reacted incredulously upon hearing the appointment of a former FSA employee cited as a solution to USDA's longstanding civil rights problems. The real answer: FSA is widely seen as the agency with the worst record of treatment of minority producers, and the very one whose failure to address civil rights complaints for many years led to the *Pigford v. Glickman* lawsuit.

The tone of the hearing then changed, with more scrutiny placed on employment practices and program delivery within USDA. Senator Tom Harkin (D–IA) noted that he was less interested in how the Civil Rights Office was processing complaints than he was in learning why complaints were still being generated. The answer came from the third panel, which included farm and employee organizations such as John Boyd of the National Black Farmers; Lawrence Lucas of the Coalition of Minority Employees; Alexander Piries, the lead attorney on the *Pigford v. Glickman* lawsuit; and others told him why. There was marked similarity in the issues they raised. USDA programs, particularly within FSA, still do not operate fairly, and USDA employees in several agencies still work in an atmosphere of discrimination and hostility.

John Zippert provided the committee not only with evidence of problems, but with recommended solutions. He called for the complete removal of FSA employees from any action responding to complaints in the *Pigford v. Glickman* lawsuit and asked that USDA and the Justice Department be told to stop appealing cases where African American farmers had their claims accepted. He urged the Senators to assure that full funding was made for the Section 2501 minority farms outreach program. He advocated that bureaucratic barriers to the Minority Farm Registry be addressed and the Registry be implemented immediately.

Zippert also countered Viadero's assertion that he found no systemic problems with the county committee system. Zippert noted that if the IG knew so little about the problems with the county committees, perhaps his other findings were also inaccurate. Senator Lugar thanked the Rural Coalition specifically for the new details on county committee elections. Both he and Senator Harkin outlined the need for more action on county committees. After many years of work by the RC and others, attention is finally being paid to the real problems with the committees and the continuing injustices within USDA. The final RC statement will soon be available on our Web site: **www.ruralco.org**.

Update is published several times a year for Member organizations and Friends of the Rural Coalition/Coalición Rural, 1411 K St., NW Suite 901, Washington, DC 20005. Phone: 202-628-7160, fax: 202-628-7165, email: ruralco@ruralco.org; Web: www.ruralco.org. Subscriptions are $25 per year. Questions about and submissions for *Update* can be directed to our Membership Coordinator, Beth Kanter.

Rural Coalition is an alliance of regionally and culturally diverse organizations, throughout the U.S. and Mexico, working to build a more just and sustainable food system. We envision a food system which:

- brings fair returns to minority and other small farmers, as well as rural communities;
- supports just and fair working conditions for farmworkers;
- protects the environment; and
- brings safe and healthy food to consumers.

**County Committees –** Below is a snapshot – the last we have – of data on the number of votes cast in the county election of 2009.  This election was in only one Local Administrative area.

Data on the over composition of county committees is also included in some attached statements.

### TOTAL BALLOTS CAST BY RACE, ETHNICITY, AND GENDER IN 2009[1]

| Gender | Ethnicity | American Indian or Alaska Native | Asian | Black or African American | Native Hawaiian or Other Pacific Islander | Unknown | White | Total Ballots Cast by Gender and Ethnicity |
|---|---|---|---|---|---|---|---|---|
| Female | Hispanic or Latino | 73 | 2 | 34 | 9 | 145 | 960 | 1223 |
| | Not Hispanic or Latino | 172 | 108 | 408 | 226 | | 3316 | 4230 |
| | Unknown | 123 | 78 | 319 | 147 | 1095 | 1782 | 3544 |
| Female Total | | 368 | 188 | 761 | 382 | 1240 | 6058 | 8997 |
| Male | Hispanic or Latino | 100 | 52 | 27 | 10 | 366 | 1332 | 1887 |
| | Not Hispanic or Latino | 392 | 106 | 823 | 125 | | 44837 | 46283 |
| | Unknown | 379 | 175 | 992 | 113 | 774 | 40435 | 42868 |
| Male Total | | 871 | 333 | 1842 | 248 | 1140 | 86604 | 91038 |
| Organization | Hispanic or Latino | 14 | 3 | 9 | 1 | 314 | 494 | 835 |
| | Not Hispanic or Latino | 142 | 95 | 448 | 28 | 277 | 78620 | 79610 |
| | Unknown | 116 | 45 | 607 | 41 | 1217 | 66204 | 68230 |
| Organization Total | | 272 | 143 | 1064 | 70 | 1808 | 145318 | 148675 |
| Unknown | Hispanic or Latino | 0 | 0 | 3 | | 8 | 92 | 103 |
| | Not Hispanic or Latino | 3 | 20 | 43 | 11 | 416 | 1325 | 1818 |
| | Unknown | 6 | 6 | 6 | 7 | 1772 | 454 | 2251 |
| Unknown Total | | 9 | 26 | 52 | 18 | 2196 | 1871 | 4172 |
| Total Ballots Cast by Race[2] | | 1520 | 690 | 3719 | 718 | 6384 | 239851 | 252882 |

### Ballot Summary

| | |
|---|---|
| LAA Total Eligible Voters | 2,021,637 |
| LAA Total Ballots Cast | 252,494 |
| Percentage of Eligible Voters that Cast Ballots | 12% |
| National Total of Ballots Disqualified | 13,156 |
| Percentage of Ballots Disqualified vs. Ballots Received | 5% |

[1] Represents only those LAAs in which an election was held in 2009

[2] Due to producers' ability to select more than 1 race, the Total Ballots Cast in 2009 may be greater than LAA Total Ballots Cast in the Ballot Summary Table

When requirements were added in the 2002 and 2008 Farm Bills to authorize the assignment of minority advisors to county committees and to update election provisions, the Congress also changed the law to tie eligibility to participate on county committees to those who participated in farm programs.  This should be extended to include farmers who are eligible to participate and registered with USDA, even if they choose not to participate.

However, issues with county committees also continue. In the past two weeks, we were contacted by an Oklahoma farmer who is employed in another state.  He had informed the County Office a few years ago that the farm had been transferred to his name.  He was seeking help because he currently has a neighbor who has been planting wheat on land that belongs to him and filing claims for payments. He has provided documentation to show that the FSA county office reached written to him demanding he send the certified lease so the

19

neighboring farmer could collect his payment. The farmer owner wrote a cease and desist letter to his neighbor and asked the office to address the issue of the illegal claims. He also noted that the lease given to the office by the neighbor was fraudulent. While he was seeking response from the county, he reported that the staff asked him not to report this as it would "get a former employee in trouble." A county committee member also asked him if he wants to sell his land.

We believe these issues merit a full review of the role and practices of the use of county committees and their continuing failure to include and serve the needs of all farmers but especially Black Farmers. In the next farm bill, we believe it is time that this committee review ways to replace county committees with a more professional and accountable system.

**FSA Farm Credit – Immediate Actions Needed**

We have worked extensively on the issues of Farm Credit over many years and hope we can provide additional recommendations as the committee addresses those particular issues.

At present, the two most essential credit related issues are to assure that Farm Service Agency issue regulations and implement the following:

1) Ensure Equitable Relief Provisions to protect the farmer in the case of errors or intentional actions in loan agreements by Farm Service Agency staff members, and
2) Implement the Heirs Property Relending Program.

With respect to the Relending program, Congress since the 2018 Farm Bill has appropriated $20 million for FSA to relend to entities qualified to lend as community development financial institution, and who have significant demonstrated experience serving the needs of socially disadvantaged farmers and ranchers.

There are such institutions available to begin working with families to resolve heirs property encumbrances which keep them out of full participation in USDA programs. These funds are urgently needed. The pandemic has caused the loss of over half a million members of our society. Some of them are farmers. Their families urgently need assistance in handling the difficult issues of settling estates. Making these program available will enable the groups who know how to do this work to immediately assist black and other people of color landowners to secure land tenure in a way the addresses the rights of all interest holders, and to emerge with a succession plan to guide that family in the future.

**Direct and Guaranteed Loans and Borrowers Rights**

Section 1005 of the American Rescue Plan provides funds to Black farmers and other people of color borrowers to pay off loans from both FSA and Farm Credit Administration. We will have attached a brief we provided to the General Accounting Office in advance of the study they did on the availability of credit to Socially Disadvantaged Farmers and Ranchers. The report suggests several issues for the attention of the Administration and the Congress. We will prepare future input on these provisions.

It is also important to understand the issues farmers are encountering due to lack of data collection and clear procedures to assure that all borrowers rights, including the Equal Credit Opportunity are assured. We have recommended to the Secretary that clear procedures for Farm Credit Borrowers to identify themselves as socially disadvantaged and eligible for the Emergency Relief provided must be set in place.

We further refer you to correspondence between Rural Coalition and both the FSA and the Farm Credit Administration referring to the case of a young farmer. We have redacted the farmer's name. These letters show how FCA tells the farmer to go to the lender, the lender says to go to FCA, and FSA asserts they have no authority on guaranteed loans. These illustrate the point that there is no clarity for the borrower and no real explanation if anyone has authority to act if farmers feel they were discriminated against on a guaranteed loan.

We urge Congress to address these gaps. We further endorse the recommendations provided in the hearing by the Federation of Southern Cooperatives that a separate entity within or similar to other farm credit institutions be established to attend to the unmet needs of this sector of farmers and ranchers.

**Heirs Property, Insecure Land Tenure, Climate and Rural Communities**

The Federation of Southern Cooperatives/Land Assistance Fund has been identifying the importance of addressing heirs property issues for decades, beginning with a 1980 Report by the Emergency Land Fund.

In 2017, the Oklahoma Black Historical Research Project convened the 100 Farmers Summit In Oklahoma City in March 2017 for in input in advance of the 2018 Summit. [1] The 100 Summit Report: *Addressing the Needs and Concerns of the Underserved Minority Family Farming Community* is included in the attachments. The following issues raised by the 100 Black farmers on heirs property include:

A) **Specific Issues Related to Heir Property** – The following were the key issues that needed to be addressed to restore access to programs for producers lacking clear title or lease on the land they farm or seek to farm:

**Heir Property:** If you have land but there is no will or document saying who will be the administrator of it, your ability to administer and use it is very difficult. If there is not an administrator for the land, you will not be able to get a loan through the USDA. For example, when you want to take out a loan, but you are the beneficiary of land along with your siblings -you have to get all other siblings to sign on to your loan. You will end up in a case with the bank and your siblings to settle your claim interest in the land. Speculators will seek out one or two siblings to see if they can buy them out, then they can petition the courts for the full property to be sold. Called a "speculating interest" in the land to cause land loss. You get a minimal amount of the value of that land.

---

[1] Oklahoma Black Historical Research Project, with Rural Coalition, etal, [1] The 100 Summit Report: *Addressing the Needs and Concerns of the Underserved Minority Family Farming Community,"* 2017.

Arkansas' law has changed – the Uniform Partition of Heirs Property Act allows an heir who is a co-owner to buy out another who wants to sell their share of a property at the market value of the property. [2]

**Adverse Possession** is also used by white farmers, investors and property owners to take land. They pay property taxes and take ownership, even where there are not their property issues. For example, an African American woman rented her land to a white farmer and as part of the rent he paid her taxes for 5 years. One year he did not pay rent and told he did not owe it because now he owned the land

**Strategies:** Get more protections in place for African-American families. A lot of risk factors that can result in land loss – need to address them comprehensively.

**Key point: There is a systemic lack of access to information and resources to resolve heir property issues -** We see a great deal of land that is idle, land that could be productive but isn't. The legal risk varies from state to state. In some states, someone can seize rights to a property simply by paying delinquent taxes. The time in which one is considered to have relinquished their rights to their land varies by state. There was a provision in the 2014 Farm Bill to help get Black farmers' land back; but it didn't go anywhere. We need new support for education on wills and estate planning."

## Heirs Property and the Ecological Costs of Discrimination

Oklahoma Black Historical Research Project worked over the past decade to engage Black farmers in NRCS programs. With Rural Coalition and the Scholars of the America University Farm Bill practicum, the researched the data and experiences of Black farmers in access USDA programs. Their findings are summarized and published in the research paper on the **Ecological Costs of Discrimination**[3]

Invasive species thrive in places facing climatic changes and put farmers at further risk. In Oklahoma, *eastern redcedar* is spreading at the rate of 800 acres a day. Without help for mitigation from USDA especially for historically underserved farmers who farm on heirs property, small cow and calf operations have seen their grazing land taken over by redcedar, which competes with pastureland by consuming up to 55,000 gallons of water per acre per year and puts the viability of their operations at further risk. Other risks they have faced over the past decade include severe cycles of floods, droughts, fires, freezes and tornados. Farmers who were deemed ineligible for NRCS program, the OBHRPI learned, were denied because they lacked the documentation to secure farm and tract numbers to demonstrate their control of the land on which they sought benefits.

---

[2] In addition to Arkansas; Alabama, Connecticut, Georgia, Montana, Nevada, New Mexico and Texas numerous states have now adopted or have introduced versions of the Uniform Partition of Heirs Property Act. Passage of the Fair Access to Farmers and Ranchers provisions in the 2018 Farm have helped build support to enact the law drafted by the nonprofit Uniform Law Commission to make it easier to divide property and preserve family wealth as the owners multiply over generations.
[3] Fagundes, Tillman, etal. **Ecological costs of discrimination: racism, red cedar and resilience in farm bill conservation policy in Oklahoma,** October 2019, Renewable Agriculture and Food Systems 35(4):1-15, DOI: 10.1017/S1742170519000322

The Fair Access for Farmers and Ranchers Act, drafted by then Rep. Fudge, and introduced in the Senate by Senators Doug Jones and Senator Tim Scott, authorized the aforementioned the heirs property relending fund. It also authorized the use of alternate methods of documentation to allow access for farmers to NRCS and other programs to allow them to care for land. For the first time in federal law, it made some of the methods consistent with the processes outlined in the Uniform Partition of Heirs Property state passed law. The third provision, Section 12607 of the 2018 Farm Bill authorized Farmland Ownership Data Collection in order to identify the land tenure trends that may affect generational transitions, and barriers to entry for beginning and socially disadvantaged farmers and ranchers.

The data and studies compiled under Section 12607 are critical inform and guide all levels of agricultural policy making that concern the critical dynamics of heirs' property and absentee land ownership in farming communities. Appropriations of $3 million annually were authorized. **We urge this committee to assure this important initiative is full funded. This baseline study is essential to allow the Congress to anticipate the impact of various kinds of climate interventions on farm and forest land tenure especially for Black Farmers.**

**Heirs Property and Forest Land**

Securing and building land tenure is also critical to protecting the intergenerational transfer of land and wealth and building a community with a healthy ecosystem and a tax base to sufficient to support quality education, employment opportunities, and a strong infrastructure. The following abstract of the paper "Taking Goldschmidt to the Woods: Timberland Ownership and Quality of Life in Alabama [4] summarizes the impact of the degree of highly concentrated land ownership on children, families and the communities:

> *Abstract: We use a database of property tax records for 13.6 million acres representing every parcel of privately owned timberland in 48 rural Alabama counties to test two hypotheses inspired by Walter Goldschmidt relating land ownership and quality of life. Our data show private ownership is highly concentrated and 62 percent is absentee owned. We employed Pearson correlations alongside Poisson and negative binomial regression models to estimate influence of both concentrated private ownership and absentee ownership of timberland. Our findings support Goldschmidt-inspired hypotheses that concentrated and absentee ownership of timberland exhibit a significant adverse relationship with quality of life as measured by educational attainment, poverty, unemployment, food insecurity, eligibility for free or reduced-price lunch at public schools, Supplemental Nutritional Assistance Program participation, and population density. Low property taxes in Alabama limit the ability of local governments to generate revenue to support public education or meet other infrastructural or service needs in rural areas. We call on rural sociologists and kindred spirits to pay more attention to the fundamental importance of land ownership which shapes the foundations of power and inequality affecting rural life in America and beyond.* [5]

---

[4] September 2020 Rural Sociology 86(1) DOI: 10.1111/ruso.12344 **Authors:** Conner Bailey, Abhimanyu Gopaul, Ryan Thomson, Auburn University; Andrew Gunnoe, Maryville College

[5] https://www.researchgate.net/publication/344021201_Taking_Goldschmidt_to_the_Woods_Timberland_Owner ship_and_Quality_of_Life_in_Alabama

We look forward to other opportunities sharing our proposals to more fully full address the set of issues we have raised, including with respect to climate. We further point to a critical need to assure farmers have access to the qualified and trusted legal and technical assistance necessary to protect their land.

In October 2019, the North Carolina Association of Black Lawyers Land Loss Prevention Project authored a Continuing Legal Education (CLE) manuscript "Assisting Heir Property Owners Facing Natural Disasters: History and Overview of Heir Property Issues." We participated in person as a panelist in the collaborative CLE webinar to train NC Legal Aid volunteer attorneys on service to impacted heir property owners. The webinar took place on October 23. According to Legal Aid's coordinator, there were approximately 124 webinar participants on that date and the course will continue to be available for training purposes.

Through individual direct legal intervention, technical assistance, outreach and policy innovation and implementation, the overall outlook for North Carolina's disaster-affected families has been substantially improved. The benefits include increased property retention, removal of barriers to assistance programs, enhanced food access, heightened farm business risk management, and family engagement in multi-generational planning as a safeguard against inherent co-ownership vulnerabilities.

We project that the pandemic will continue to emphasize the need for education on what defines sustainability and how environmental, economic, health stressors are intertwined and cumulative. This highlights the importance of collaborative work we have all done to expand the framework of justice and increase the tools and resources available to communities to take direct action to promote community health. We see our engagement with Black and Brown-led coalitions and initiatives advancing sustainable environments and community-controlled food only deepening and expanding.

We will provide a letter to Chairman Scott and the Committee in upcoming weeks that better summarizes our immediate recommendations for action.

**Conclusion**

Today, black farmers find themselves still seeking financial compensation from years of discrimination by the United States Department of Agriculture (USDA). This financial compensation, along with the American Rescue Plan, has been called "unfair reparations," "another handout," or some other dehumanizing term by prominent and influential elected officials and others. This continued systemic and institutionalized racism is further evidence of the unrelenting discrimination that black farmers and their communities experience on a daily basis. Furthermore, many black farmers, their families and communities continue to be on the brink of bankruptcy, foreclosure, and homelessness. The USDA must act now to implement the American Rescue Plan and related initiatives to empower black farmers and their communities. The American Rescue Plan and related initiatives can only be successful if the USDA pays off black farmers' USDA farm loan debts, creates an inclusive and equitable implementation process for the $1B authorized by Section 1006, and prioritizes policies that help black farmers and their communities to hold onto their land and protect it from further discriminatory practices.