IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

ADAM P. FAUST et al.,

   Plaintiffs,

   v.        Case No. 1:21-cv-00548-WCG

THOMAS J. VILSACK et al.,

   Defendants.

## REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

WISCONSIN INSTITUTE FOR LAW & LIBERTY

Rick Esenberg
*rick@will-law.org*

Daniel P. Lennington
*dan@will-law.org*

Luke N. Berg
*luke@will-law.org*

Katherine D. Spitz
*kate@will-law.org*

330 E. Kilbourn, Suite 725
Milwaukee, WI 53202-3141
Phone: 414-727-9455
Fax: 414-727-6385

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT IN REPLY ..................................................................................... 3

  I.   Compelling Interest: Defendants Have Not Offered Evidence of a Recent
      Episode of Intentional Discrimination Perpetuated by the Government ........... 3

  II.  Narrowly Tailored: Defendants Have Not Considered Race-Neutral
      Alternatives or Explained How the Program Is Not Both Underinclusive
      and Overinclusive ................................................................................................ 8

  III. Plaintiffs Will Be Irreparably Harmed Without an Injunction ......................... 15

  IV. The Public Interest and Balance of Harms Support an Injunction .................. 19

  V.  Defendants Provide No Alternative to a Nationwide Injunction ..................... 20

CONCLUSION ................................................................................................... 20

**INTRODUCTION**

In enacting this program, Congress did something it has never done in the modern era. It created a huge government program in which all the funds will be allocated solely on the basis of race. Our government has decreed that every farmer belonging to selected racial groups will have all their loans forgiven. No white farmer will have any of his or her loan forgiven. Minority farmers need not show that they were—or even could have been—the victim of past discrimination. The racial preference is comprehensive (preferred races benefit and the rest get nothing) and absolute (loans are completely forgiven and then some). Even if the evidence could justify some kind of racial preference (and it cannot), there is no basis upon which this Court could conclude that favoring all minority farmers over all white farmers in such a substantial way is narrowly tailored to achieving a compelling interest.

In support of their race-based loan-forgiveness program, Defendants point to USDA's history of past discrimination, which was addressed by a detailed claim procedure in the *Pigford* litigation and through numerous settlements and reforms. After providing billions of dollars in relief, we are told that Congress can still enact such an extraordinary race-based measure because of largely unspecified "lingering effects" of discriminatory acts that occurred—for the most part, if not entirely— decades ago. In assessing this claim, this Court cannot rely on "continuing" racial disparities. To do so would effectively give Congress a blank check to enact any race conscious program to remedy any present racial disparity. The Supreme Court, however, has called such attempts at racial balancing "patently unconstitutional."

*Grutter v. Bollinger*, 539 U.S. 306, 330 (2003). Defendants must prove that what they did in the past prevents minority farmers from succeeding today. Simply showing that the financial position and overall number of minority farmers are not what the government would like it to be does not mean that past remedial efforts did not "work" or that the government may now treat all minority farmers differently than all white farmers. This equates non-discrimination with racial balance—something the Supreme Court has repeatedly said is not permitted. *See Parents Involved in Cmty. Schs. v. Seattle¸ Sch. Dist. No. 1*, 551 U.S. 701, 730 (2007) ("Allowing racial balancing as a compelling end in itself would effectively assure that race will always be relevant in American life, and that the ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race will never be achieved.") (citation omitted).

Even if there were "lingering effects" of past USDA discrimination, nothing in the record comes close to establishing that every farmer in America must be treated differently based on the color of his or her skin. Not only is a preference of this breadth unsupported, any number of race-neutral options are available, including a program to identify and remedy victims of USDA's past discrimination, or a relief program for those who have not benefited from prior COVID relief packages. Defendants reject such race-neutral alternatives, contending that they have tried everything and failed. But that is not the case: race-neutral opportunities abound.

The Court, therefore, should affirm its well-reasoned decision to grant a temporary restraining order and issue a preliminary injunction, so that Defendants

cannot effectuate their race-based program while this case proceeds, making it difficult, if not impossible, to remedy the flagrant race discrimination. Also Plaintiffs note that just as of today, the U.S. District Court for the Middle District of Florida entered a nationwide injunction against Section 1005 of ARPA for many of the same reasons noted below. *Wynn v. Vilsack*, No. 21cv514 (M.D. Fla., June 23, 2021).

## ARGUMENT IN REPLY

### I.  Compelling Interest: Defendants Have Not Offered Evidence of a Recent Episode of Intentional Discrimination Perpetuated by the Government

Defendants concede that ARPA § 1005 must be evaluated under strict scrutiny. Dkt. 35:16. "This is a very demanding standard, which few programs will survive." *Vitolo v. Guzman*, No. 21-5517, 2021 WL 2172181, at *4 (6th Cir. May 27, 2021).

As this Court noted in its temporary restraining order, the government establishes a "compelling interest in remedying past discrimination only when three criteria are met." Dkt. 21:4. Any race-based program must be narrowly tailored to address (1) a "specific episode" (2) of "intentional discrimination" (3) that the government "had a hand in." *Id.* (citing *Vitolo*, 2021 WL 2172181, *4–5 (collecting cases)). As noted above, the desire for "racial balancing" or proportional participation in government programs is not compelling. *Parents Involved*, 551 U.S. at 730; *Freeman v. Pitts*, 503 U.S. 467, 494 (1992). Thus, racial disparities—even if they prevent racially proportionate receipt of government benefits—are not enough. *See Richmond v. J.A. Croson Co.*, 488 U.S. 469, 495 (1989). Instead, there must be evidence of *intentional* discrimination, not just disparities. *Id.* at 503. Put differently,

the government must establish "identified discrimination" "with some specificity" and "with a strong basis in evidence." *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996).

In their brief, Defendants point to two categories of evidence: (1) "statistical and anecdotal evidence recounting discrimination" during the last century by USDA, and (2) so-called "lingering" discrimination in the form of statistical disparities, including disparities in prior attempts at COVID relief. *See* Dkt. 35:18–25. Neither category is sufficient to satisfy strict scrutiny.

*First*, Defendants point to generalized evidence of discrimination documented in reports from 1965, 1982, and 1997 about USDA's discriminatory conduct. Dkt. 35:18–19. Citing the 1965 report, Defendants note that USDA provided Black farmers with "consistently … inferior loans." Dkt. 35:18. And, reciting evidence recounted thoroughly in *Pigford v. Glickman*, 185 F.R.D. 82, 86 (D.D.C. 1999), Defendants discuss USDA's refusal to provide technical services to Black farmers or an adequate civil rights process. Dkt. 35:19. This evidence culminated in a 1997 report, which (looking back at the 1980s and 1990s) found "unexplained delays in processing [minority] loan applications, arbitrary reductions in farm loans by county officials, and failures to receive promised loans." Dkt. 35:19. In general, the *Pigford* allegations (as well as the companion cases alleging discrimination against Hispanics, Native Americans, and women) cover the period from 1981 to 1996. 185 F.R.D. at 89.

But this proves much less than Defendants suppose. Congress and USDA responded to this evidence with specific and comprehensive remedies in the 1990s and 2000s. Dkt. 35:20. Defendants recount the billions spent, processes established,

and laws changed to rectify this past discrimination. Dkt. 35:20–21. Plaintiffs also explained these processes and remedies in their main brief. *See* Dkt. 14:7–11.

Because the government has already taken comprehensive steps to remedy USDA's history of past discrimination, Defendants cannot now use that past discrimination to justify continued discrimination. *See Parents Involved*, 551 U.S. at 721 ("Once Jefferson County achieved unitary status, it had remedied the constitutional wrong that allowed race-based assignments. Any continued use of race must be justified on some other basis."); *Clark v. Putnam Cty.*, 293 F.3d 1261, 1273 (11th Cir. 2002) ("The need for a race-based remedy in 1992 cannot be established by reliance on a 1982 wrong that has already been remedied."). The reason for rejecting recycled justifications is simple: if Defendants win this case based on this record, and then Congress adopts yet another race-based program for non-white farmers next year, Defendants could simply rely *again* on the same allegations. There would be no logical stopping point to this cycle of government-sponsored discrimination because the government could always invoke its past bad acts to justify future discrimination.

Moreover, Defendants' evidence of past discrimination is simply too remote to support a race-based program. *See, e.g., Brunet v. City of Columbus*, 1 F.3d 390, 409 (6th Cir. 1993) (discrimination from 14 years earlier too remote to support affirmative action program); *Detroit Police Officers Ass'n v. Young*, 989 F.2d 225, 228 (6th Cir. 1993) (proffered evidence "no longer serves the same compelling state interests as it once did under the changed circumstances of almost two decades."); *Hammon v. Barry*, 826 F.2d 73, 76–77 (D.C. Cir. 1987) (discrimination from 18 years earlier too

remote). In fact, Defendants have not pointed to any evidence of intentional discrimination during the last two decades.[1] Conclusory recitations about lack of "access" (by which Defendants mean statistical disparities in things like whether credit has been extended, but without any analysis of the reason for the differences), differences in default rates, unspecified or verified complaints, and unidentified anecdotes of unknown veracity or severity cannot justify yet more racial preferences.

If Defendants are permitted to rely on allegations that go back as far as the 1890s,[2] or even the 1980s and 1990s, then there would again be no logical stopping point. For this reason, discrimination supporting a compelling state interest "must be reasonably current," *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 50 F. Supp. 2d 741, 763 (S.D. Ohio 1999), otherwise the evidence is "too remote in time to establish the compelling interest," *F. Buddie Contracting, Ltd. v. Cuyahoga Cmty. Coll. Dist.*, 31 F. Supp. 2d 571, 581 (N.D. Ohio 1998). Adopting Defendants' position (that evidence from any decade *or century* will do) would "effectively assure[ ] that race will always be relevant in American life, and that the ultimate goal of

---

[1] Defendants cite testimony of allegations about USDA requiring dual signatures for Black farmers but not others and "Hispanic and Asian farmers" reporting being "stereotyped." This testimony is vague, second-hand, undated, and unsupported by any specific allegations. *See* Dkt. 35:21–22. Defendants also point to a 2011 report, but do not identify any parts of the report that discuss recent, intentional discrimination by USDA. The closest the report gets is saying that there is a "strong perception" that USDA "continues to discriminate." Dkt. 35:21 (citing JL report, p. 38). But Defendants cannot cite any case finding a compelling state interest based on evidence of a "strong perception" of "continued discrimination." Finally, Defendants cite complaints about USDA as recent as 2019, Dkt. 35:27, but those complaints are not proof of intentional discrimination—they are simply statistical disparities, which, as already explained, are not enough.

[2] *See* Dkt. 35:17 (citing the 1965 report, discussing discrimination resulting from the Second Morrill Act of 1890).

eliminat[ing] entirely from governmental decisionmaking such irrelevant factors as a human being's race, will never be achieved." *J.A. Croson Co.*, 488 U.S. at 495 (plurality opinion) (citations omitted).

*Second,* Defendants rely vaguely on the "lingering effects" of past discrimination. When evaluated closely, however, Defendants' "lingering effects" are simply recitations of present racial disparities that Defendants blame on past discrimination. For example, Defendants cite racial disparities in the "ability to access credit," "foreclosure rates," "farm ownership," "income," "access to financial services," and "the pandemic's disproportionate impact on the health and welfare of minorities in this country." Dkt. 35:21–24. Defendants also point to "underrepresentation" of certain racial groups in the "USDA workforce," which is irrelevant to discrimination against farmers and ranchers. Dkt. 35:37–38, n.38.

As in *Parents Involved*, Defendants cannot prove that existing disparities among currently indebted farmers are the product of episodes of intentional discrimination from decades and centuries past. *Parents Involved*, 551 U.S. at 721 ("We have emphasized that the harm being remedied by mandatory desegregation plans is the harm that is traceable to segregation, and that the Constitution is not violated by racial imbalance in the schools, without more."). Defendants do not explain what USDA did after 1997, nor do they attempt to explain the "exact connection" between these unspecified lingering effects of discrimination and why a preference must now be extended to every minority farmer in the country. *Parents Involved*, 551 U.S. at 720 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003)).

Defendants believe that a compelling state interest can be proven merely by reciting evidence of past discrimination and then noting current racial disparities. *See* Dkt. 35: 25–31. No case supports such unfocused analysis. In support of their theory, Defendants point to *Majeske v. City of Chicago*, 218 F.3d 816, 821 (7th Cir. 2000). The plaintiffs there relied on expert testimony and statistical models about the number of African-American detectives in the Chicago Police Department. The Seventh Circuit relied on the proven *connection* between evidence of discrimination in hiring, assignment, and promotion, and the then-existing disparity in the detective ranks. *Id.* at 820–21, 822. But here, Defendants have not proven any such connection other than their conclusory say-so. There is no evidence that present-day racial disparities in, say, "foreclosure rates" or "ability to access credit" among today's farmers are a direct consequence of USDA's loan processing delays experienced by long-gone farmers from the 1960s, or an unfair complaint procedure in the 1980s.

## II. Narrowly Tailored: Defendants Have Not Considered Race-Neutral Alternatives or Explained How the Program Is Not Both Underinclusive and Overinclusive

Narrow tailoring requires "a close match between the evil against which the remedy is directed and the terms of the remedy." *Builders Ass'n of Greater Chicago v. Cnty. of Cook*, 256 F.3d 642, 646 (7th Cir. 2001). In other words, a program must discriminate no more than is necessary to address the harm it is intended to remedy. *Id.* at 644; *Shaw*, 517 U.S. at 909–10; *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224, 235, 237–38 (1995). Defendants' race-based loan forgiveness program is not narrowly tailored for at least five independently sufficient reasons.

*First*, "narrow tailoring" requires "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339. Defendants have not seriously considered available race-neutral alternatives. As an initial matter, ARPA is a *COVID relief* bill. COVID hit all farmers, so the most obvious alternative is to provide relief to all. *See* Dkt. 14:26–27 (listing options). And even if Congress wants to target past discrimination or disparities, just two possibilities include: (1) providing race-neutral relief to farmers who have been left out of previous programs, and/or (2) remedying past discrimination by helping the specific victims of USDA's past discrimination (or their heirs) through a claims process like *Pigford*.

According to Defendants, during Congress's earlier attempts to respond to COVID, minority farmers "got short-changed again, reportedly receiving a tiny fraction of CFAP funds less than a year after being largely left out of the single largest U.S. agricultural subsidy." Dkt. 35:31. Assuming this is true (and Defendants don't even say whether minority farmers received disproportionately less COVID relief funds), a narrowly tailored program would provide relief to *all* farmers who were "left out" of previous programs—a simple race-neutral option. Defendants do not explain why this option is insufficient but assert generically that race-neutral remedies have "not worked to remedy" so-called "lingering effects" of past discrimination.

The *Pigford* claim-and-settlement model offers a second narrowly tailored option to address prior government discrimination: Defendants could provide relief only to those victims of past discrimination. But it may not use discrimination against some members of a racial class to provide a racial preference to other members of that

class whether or not they were victims of that discrimination: "Individuals who have been wronged by unlawful racial discrimination should be made whole; but under our Constitution there can be no such thing as either a creditor or a debtor race. That concept is alien to the Constitution's "Constitution's focus upon the individual." *See Adarand Constructors, Inc.,* 515 U.S. at 239 (Scalia, J., concurring). Defendants only response is that prior *Pigford* settlements were "eroded by state taxes" and resulted in an "unbearable tax debt." Dkt. 35:34–35. Yet Congress knows how to deal with that issue and could fix it. As Defendants have recently noted, the extra 20% tacked onto the loan forgiveness is for the purpose of dealing with tax liability.[3] So to the extent that prior *Pigford*-type claims processes were "eroded by state taxes," Congress could create a new claim process to avoid such prior pitfalls for those who can show they were harmed by this erosion in the past.

In fact, a narrowly tailored remedy *must* focus on addressing past *intentional* discrimination, not simply "lingering effects." Courts within this circuit have considered "lingering effects" only when there is a proven causal nexus between those "lingering effects" and past *intentional* discrimination. *See Chicago Fire Fighters Union Local 2 v. City of Chicago*, 1999 WL 1289125 (N.D. Ill. Dec. 30, 1999) (reciting extensive statistical and anecdotal evidence of discrimination in all ranks of a fire department, along with expert testimony explicitly linking that discrimination with current disparities, to conclude that the City's affirmative action plan was narrowly

---

[3]    *See* USDA Website, "American Rescue Plan Debt Payments," farmers.gov/americanrescueplan (last visited June 21, 2021) ("the 20% portion is available for tax liabilities and other fees associated with payment of the debt").

tailored); *Horan v. City of Chicago*, 2003 WL 22284090 at *80 (N.D. Ill. Sept. 30, 2003) (upholding the same program for several years further in the 1990s where statistics and expert testimony showed a continuing link between discrimination and disparity and where affirmative action was the "only mechanism available to the City as a remedial step" in light of the limitations of the collective bargaining agreement and state law); *McNamara v. City of Chicago*, 959 F. Supp. 870, 874–76 (N.D. Ill. 1997), *aff'd* 138 F.3d 1219 (7th Cir. 1996) (setting out evidence tying "the lingering effects of *purposeful* discrimination" to practices aimed at "the defeat of court-ordered integration"). Plaintiffs are unaware of any controlling authority holding that statistical disparities unlinked to past *intentional* discrimination by a government actor (as opposed to statistical disparities alone) would satisfy narrow tailoring.

Defendants' response to a narrowly tailored alternative appears to be that Congress and USDA have already tried everything and failed. Defendants point to previous attempts by USDA and Congress to remedy past discrimination, such as greater minority representation in the loan process and increasing minority farmers' awareness of USDA programs. Dkt. 35:32. Defendants call these past programs "failure[s]." Even if Defendants believe their prior efforts have been a "failure," the suitable remedy is not "make-up" discrimination against white farmers and ranchers. *See Adarand Constructors, Inc.,* 515 U.S. at 239 (Scalia, J., concurring). As this Court put it, "[t]he obvious response to a government agency that claims it continues to discriminate against farmers because of their race or national origin is to direct it to stop: it is not to direct it to intentionally discriminate against others." Dkt. 21:6.

*Second*, Defendants argue that the race-based loan forgiveness program is "both flexible and time-limited." Dkt. 35:32. This is just a one-time remedy, according to Defendants. But Defendants do not promise that ARPA § 1005 will fix any identified disparities, such as income, access to credit, USDA employee representation, or foreclosure rates. It is simply not logical to assume that forgiving loans of non-white farmers will lead to racial balancing in rates of income, foreclosures, credit access, or USDA's hiring practices, even if racial balancing was permitted, which it is not. *Parents Involved*, 551 U.S. at 731 ("racial balancing has no logical stopping point") (citation omitted). A racial preference is not justified because it is a "one-off." Defendants are proposing a massive subsidy—complete cancellation of farm debt solely based on the color of the farmer's skin. That they may only do it this "one time" does nothing to answer the constitutional objections raised here.

Also, Defendants claim this program is "flexible" because white farmers and certain other disfavored minorities can write a letter to Secretary Vilsack seeking inclusion in the program despite their exclusion from the definition of "socially disadvantaged." Dkt. 35:33. Plaintiffs are unaware of any case suggesting that an otherwise racially discriminatory program is "flexible" because those victims of the discrimination can write a letter to a cabinet official seeking an exception to the discriminatory policy. Even if other races could be included (which is not at all clear), the mere presumption of an exclusion is a constitutional harm. *See Vitolo,* 2021 WL 2172181, at *6 ("The designated races get a presumption that others do not.")

*Third*, Defendants claim, quite surprisingly, that there is "no evidence that USDA has denied equal treatment to white farmers." Dkt. 35:33. Plaintiffs are, under the terms of the statute, ineligible for this program due to their race; therefore, they are denied equal treatment. This is a constitutional harm because "a racial classification causes fundamental injury to the individual rights of a person." *Shaw,* 517 U.S. at 908 (citation omitted). Indeed, the *primary* injury "in an equal protection case of this variety is the denial of equal treatment" itself. *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). Imagine that the government declared a one-year tax amnesty for white people or the cancellation of student loan debt for everyone but persons of Asian descent. No one would question that equal protection had been denied.

*Fourth*, Defendants' racial categories are overinclusive and underinclusive. Defendants respond that they have been using the proposed racial groups since 2001 and that each group's inclusion or exclusion is supported by evidence. Dkt. 35:33–34. But this is simply not the case. Although a 2011 report mentions Alaskan Natives in a few contexts (such as underrepresentation in USDA offices), the report does not document *intentional* discrimination against Alaskan Natives that must be remedied with loan forgiveness. Dkt. 35:37, 38, n. 38. The same is true for Native Hawaiians and Asians. *Id*. At most, Defendants' citations discuss that certain of these groups may "believe" they cannot be promoted within USDA, or again, that there is some underrepresentation in USDA staffing. But Defendants have not pointed to evidence of a "specific episode" of "intentional discrimination" "perpetuated" by USDA

involving Native Hawaiian, Alaskan Native, or Asian farmers and ranchers. Even if Defendants' evidence pointed to USDA's ongoing disparities involving these racial groups, it is hard to imagine how a *loan forgiveness program* for farmers would be narrowly tailored to address all identified disparities.[4]

*Finally*, Defendants have no meaningful response to Plaintiffs' arguments that the loan-forgiveness program is underinclusive because Defendants exclude women. As explained in Plaintiffs' main brief, USDA has considered women "socially disadvantaged" for decades. *See e.g.,* 7 C.F.R. §§ 761.2; 7.3; 1430.402. But now, for the purposes of loan forgiveness under Section 1005, Defendants no longer believe that women qualify as "socially disadvantaged farmers and ranchers." Defendants have no response to this argument other than to say that women can be minorities too, and so women are not universally excluded. True, women can be minorities. But this does not explain why white women are no longer socially disadvantaged for this program.

---

[4] Defendants rebuff the argument of that their program is underinclusive by not including all Asians in their definition of "Asians." Defendants apparently disavow any reliance on the longstanding federal definition of Asians. This would be a first among federal agencies. Plaintiffs are not aware of any federal agency, law, or regulation that defines "Asians" as people originating broadly from the continent of Asia, as Defendants apparently do now. Instead, federal law uniformly limits "Asians" only to those individuals whose ancestors are from the "Far East, Southeast Asia, the Indian Subcontinent, or the Pacific Islands." *See, e.g.,* 28 C.F.R. § 42.402; 13 C.F.R. § 124.103. Federal law excludes Asians from the Middle East and North Asia. *Id; see also Vitolo*, 2021 WL 2172181, at *7. Plaintiffs accept Defendants' unique concession that they do not exclude certain Asians as all other federal agencies do. But despite this concession, Defendants still do not explain why they would exclude certain North Africans from the program (from Egypt and Algeria, for example), as such groups are uniformly regarded as "White" in federal law, and therefore ineligible for Defendants' program. *See, e.g.,* 32 C.F.R. § 191.3 ("A [white] person [has] origins in any of the original peoples of … North Africa."). In any event, this dispute about who is "White" or "Asian" simply demonstrates the dangers of racialized government programs.

### III.    Plaintiffs Will Be Irreparably Harmed Without an Injunction

As Plaintiffs explained in their opening brief, a preliminary injunction is warranted both to prevent the harm inherent in blatant race discrimination, Dkt. 14:23–25, and to force Congress (and/or USDA) to eliminate the racial criteria, giving Plaintiffs an "equal shot at" this relief, Dkt. 14:25–28.

In its TRO decision, this Court agreed that "Plaintiffs will suffer irreparable harm absent a temporary restraining order." Dkt. 21:7. This Court concluded that, without an injunction, USDA would proceed to "spend the allocated money and forgive the loans of minority farmers while the case is pending" and, as a result, Congress would have "no incentive to provide similar relief on an equitable basis to others." Dkt. 21:7. Plaintiffs likely could not recover damages, "in light of Defendants' sovereign immunity," and forgiven loans "cannot easily be undone." Dkt. 21:7–9. The Court also found "extraordinary" Defendants' position "that racial discrimination inflicts no harm at all" that warrants an injunction. Dkt. 21:7.

The harms that this Court found supported a TRO also warrant a preliminary injunction, for the same reasons. Nothing Defendants add changes the analysis.

Defendants' only significant new argument is that the exclusion of white farmers from the loan forgiveness program is not an irreparable harm because Plaintiffs could, theoretically, get "forward-looking injunctive relief to gain access to the programmatic funds" later in this case. Dkt. 35:14. Defendants cite *Bowen v. Massachusetts*, 487 U.S. 879 (1988), for the proposition that sovereign immunity "does not foreclose 'specific remedies' that 'attempt to give the plaintiff the very thing

to which he was entitled,' which, in some cases, may be money owed under a federal program.'" *Id*. This argument fails for multiple reasons.

As a preliminary matter, Defendants do not *concede* that such a remedy is actually available here; instead, they carefully hedge that this relief would only be available "if [Plaintiffs] can show they are entitled to payments under § 1005." Dkt. 35:14; *see also* Dkt. 35:14 n.23 (indicating that such relief would not be available if "Plaintiffs concede that they are ineligible."). But that is exactly the problem. As written, Plaintiffs are *not* "entitled to payments under § 1005," because the *sole* requirement is race, and Plaintiffs do not fall within the eligible racial categories.

Even putting that point aside, it is not clear at all that an injunction requiring USDA to forgive Plaintiffs' loans would qualify as "specific relief" that is exempt from immunity under *Bowen*, rather than damages. As the Supreme Court subsequently explained (quoting Justice Scalia's dissent in *Bowen*), "suits seeking … to compel the defendant to pay a sum of money to the plaintiff," "whether by judgment, *injunction*, *or declaration*" are, "[a]lmost invariably," "suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210, 211–12 (2002) (emphasis added); *see also Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1330 (2020) (distinguishing *Bowen* on multiple grounds, including that *Bowen* involved "the Government's ongoing obligations under the Medicaid program" (whereas this case involves a one-time COVID relief bill)); *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999) (also

distinguishing *Bowen*). The Seventh Circuit has also noted the difficulty in applying *Bowen*'s distinction between "specific" and "substitute" relief. *E.g., Builders NAB LLC v. Fed. Deposit Ins. Corp.*, 922 F.3d 775, 777 (7th Cir. 2019); *Columbus Reg'l Hosp. v. Fed. Emergency Mgmt. Agency*, 708 F.3d 893, 896 (7th Cir. 2013). Defendants hint that they will oppose such a remedy later in this case, *see supra*, and they may seek to distinguish *Bowen* on any number of grounds.

But there is an even more fundamental problem. A remedy that invalidates the racial criteria, while otherwise leaving the loan-forgiveness program in place, would effectively rewrite the statute, creating a new (and significantly larger) loan-forgiveness program with no criteria whatsoever, such that *all* farmers' loans would be eligible for forgiveness. It is well-established, however, that "our constitutional structure does not permit [courts] to 'rewrite the statute that Congress has enacted.'" *See Puerto Rico v. Franklin California Tax-Free Tr.*, 136 S. Ct. 1938, 1949 (2016). As Plaintiffs noted, there are multiple possible fixes, but that choice is ultimately for Congress, not the courts. So, even if *Bowen*'s narrow exception to immunity applied, Defendants can, and likely will, oppose any remedy requiring USDA to forgive white farmers' loans on the additional ground that it would transform and significantly expand the program. Thus, an injunction is the only workable remedy.

This point, in particular, demonstrates why Defendants' emphasis on the fact that "there is no finite amount of money budgeted for the program," Dkt. 35:12, is irrelevant. While it's true that there is no fixed sum, Congress approved the program based on its estimates of what it would cost; and it is not "for judges to speculate as

to what Congress would have enacted if it had not enacted what it did." *Miller v. Albright*, 523 U.S. 420, 457 (1998) (Scalia, J., concurring).

Defendants' other arguments are equally unavailing. They quibble with how much money will be "imminently" spent in the next *two* weeks without an injunction, Dkt. 35:11–12, but Defendants have represented that "88% of the total ARPA-eligible payments," Dkt. 17-2, ¶ 25, representing 64% of the anticipated funds, *see* Dkt. 17-2, ¶¶ 22, 26, will be paid out, on a rolling basis, within nine weeks of June 9 (two weeks ago). So there is no question that *most* of the money will be spent before this case can reach a final judgment. And if Defendants oppose a judicial remedy expanding the program to all white farmers (as they hint they will), and/or the appellate courts conclude that such a remedy is not available, *see supra*, then there will be no possible remedy, since, having effected its goal of race-based COVID relief, Congress will have "no incentive to provide similar relief on an equitable basis to others." Dkt. 21:7.

Finally, Defendants emphasize that Plaintiffs have not cited a Seventh Circuit case presuming irreparable harm for equal protection violations, Dkt. 35:14, but neither do Defendants cite a case rejecting such a presumption—the Seventh Circuit simply has not addressed this yet. The Sixth Circuit has, in a recent and very similar equal protection case, *Vitolo,* to which Defendants have no good answer. Defendants also attempt to distinguish the D.C. Circuit's decision in *O'Donnell* on the grounds that the plaintiff there had "little hope of obtaining adequate compensatory or other corrective relief at a later date," 963 F.2d at 428, but the same is true here, *see supra*, and the D.C. Circuit *also* emphasized that an injunction would serve to "maintain[ ]

a system of laws free of unconstitutional racial classifications," *id*. 429. In any event, irreparable harm certainly should be presumed when the government so blatantly makes funds contingent on race. Defendants' position that open race discrimination causes no inherent harm is, as this Court put it, "extraordinary." Dkt. 21:7.

## IV. The Public Interest and Balance of Harms Support an Injunction

Finally, as Plaintiffs argued and this Court already found, an injunction will "serve the public's interest in maintaining a system of laws free of unconstitutional racial classifications." *O'Donnell Const. Co.*, 963 F.2d at 429; Dkts. 14:28–29; 21:8–9.

Defendants' only counter is that an injunction will harm minority farmers who were eligible for loan forgiveness and might be foreclosed on without that relief. Dkt. 35:38–39. Defendants concede that USDA itself "will not foreclose on delinquent borrowers of direct loans," and has "ask[ed] lenders to suspend *all* adverse actions for *all* SDA guaranteed loan borrowers," but they argue that USDA "cannot prevent other lenders from pursuing foreclosure actions." Dkt. 35:38. Defendants offer no evidence that other lenders *are* pursuing or *imminently will* pursue any foreclosure actions that would not occur if ARPA's race-based loan forgiveness were implemented. They only offer the speculative statement that "[a] delay in these payments *could* result in [ ] foreclosure" for some farmers. Dkt. 17-2, ¶ 39 (emphasis added). That is not enough to allow flagrant—and nationwide—race discrimination to continue. Moreover, there is nothing preventing Congress from promptly amending the program to provide relief to all farmers without relying on race.

## V.   Defendants Provide No Alternative to a Nationwide Injunction

This Court issued a nationwide TRO, finding no workable alternative, because "[i]f the USDA forgave Plaintiffs' loans, it would be required to forgive every farmer's loan, since the only criteria for loan forgiveness is the applicant's race." Dkt. 21:9. The same is true with respect to a preliminary injunction.

Nevertheless, Defendants continue to press the argument that a nationwide injunction is inappropriate, relying primarily on Justice Thomas's concurrence in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), and Justice Manion's concurrence in *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020). Dkt. 35:39–40. But the views of a single Justice or judge are not the law. The *Barr* majority held that nationwide injunctions "can be necessary" in some cases, 961 F.3d at 916, as have many other appellate courts, Dkt. 19:6–7, and the Supreme Court recently upheld an injunction that applied nationwide, *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2088 (2017). Moreover, most of the relevant factors the Seventh Circuit has identified cut in favor of a national injunction here, including "the nature of the violation, the extent of the impact, the urgency of the situation, [and] the multiplicity of litigation." 961 F.3d at 917. The constitutional violation is blatant and straightforward; it affects all white farmers equally; relief is urgently needed to remedy the violation; and a limited injunction would multiply the lawsuits and plaintiffs. And Defendants simply have not offered a workable alternative remedy. *Supra* Part III.

## CONCLUSION

This Court should issue a preliminary junction enjoining Defendants from implementing Section 1005 of ARPA in a way that discriminates based on race.

Dated: June 23, 2021

WISCONSIN INSTITUTE FOR LAW & LIBERTY
Attorneys for Plaintiffs

Rick Esenberg
*rick@will-law.org*

*/s/ Daniel P. Lennington*
Daniel P. Lennington
*dan@will-law.org*
Luke Berg
*luke@will-law.org*
Katherine D. Spitz
*kate@will-law.org*
330 E. Kilbourn, Suite 725
Milwaukee, WI 53202-3141
PHONE: 414-727-9455
FAX: 414-727-6385